**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| THE ESTATE OF SCOTT | ) | |
| SCHULTZ, et al., | ) | |
|     Plaintiffs, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. |
| | ) | 1:19-cv-4083-JPB |
| BOARD OF REGENTS OF THE | ) | |
| UNIVERSITY SYSTEM OF | ) | |
| GEORGIA, et al., | ) | |
|     Defendants. | ) | |

## BRIEF IN SUPPORT OF MOTION TO DISMISS

Defendants Board of Regents of the University System of Georgia and Tyler

Austin Beck, through counsel, submit this brief in support of their motion to dismiss.

## INTRODUCTION

This lawsuit arises from the undeniably tragic death of Scout Schultz[1] but presents

no cause of action against the Board of Regents or Georgia Tech police officer Tyler

Beck. Scout was a student and member of the Georgia Tech community who died on

September 16, 2017, after placing a 911 call in which they identified themself as a person

"skulking" on campus with a "knife in his hand" and possibly a "gun on his hip." When

responding officers approached, Scout refused multiple commands to drop the knife.

---

[1] At Georgia Tech, Scott Schultz was known by the first name Scout and used the
pronouns they, them, theirs.

Instead, with what can be seen on video as deliberate movement, they advanced on the officers with knife in hand up the college campus street where the incident occurred and across the street until the officers were backed up against a public parking deck. Student living and study areas and also car and pedestrian traffic were in close proximity to this encounter. There is an audio recording of Scout's 911 call. Campus security cameras created a video record of the incident from the time Scout placed the 911 call to the final moment of the encounter. And there is a cell phone video and audio recording of the final minute and eight seconds before Officer Beck discharged his service weapon at an advancing Scout. As this record plainly shows, Scout was asked multiple times in that last minute and eight seconds alone "what's your name," they were told clearly and loudly not less than 14 times "drop the knife" or "drop it," they were told not less than 2 times clearly, loudly, and in a commanding and urgent tone immediately before the use of force "do not move," but they ignored and refused all of those commands and instead advanced on the officers up to the final moment, as stated, with apparent deliberate movement. Scout presented no option to responding officers other than the option to use force to stop their advance with a weapon or instrument that if used offensively could inflict serious bodily harm or even death.

While undeniably tragic, Scout's death gives rise to no cause of action in these circumstances. Officer Beck's use of deadly force in the circumstances was reasonable; at

a minimum, it cannot be said that every officer would conclude that using deadly force to stop Scout's advance – an act which, under Georgia law, amounted to aggravated assault, aggravated assault on a public safety officer, and felony obstruction of an officer – would violate the Fourth Amendment. For these reasons, no Fourth Amendment claim is stated against Officer Beck and qualified immunity bars that claim.

The complaint also does not state a claim against the Board of Regents under Title II of the Americans with Disabilities Act or section 504 of the Rehabilitation Act in the circumstances presented here. Congress did not intend for these statutes to apply to restrict peace officers in their on-the-street responses to reported incidents or disturbances; at least, it did not intend to place restrictions on officers before the point in time when they have secured the scene and ensured that there is no threat to human life. Even assuming these statutes apply in this context, no claim is stated here for several reasons. The Eleventh Amendment and sovereign immunity bar the ADA claim because there is no valid abrogation of sovereign immunity under the ADA without an underlying constitutional violation, and here the Fourth Amendment claim fails. The complaint does not plausibly show discrimination on the basis of disability. And compensatory damages are not available under Title II or section 504 absent intentional discrimination, which means deliberate indifference of a responsible official, and here the complaint does not plead facts plausibly showing such deliberate indifference.

# FACTUAL BACKGROUND

## A. The Complaint Allegations[2]

Scout Schultz was a student at Georgia Tech. Doc. 1 ¶ 11. They "suffered from mental health issues," including clinical depression, and as a student they had "sought mental health services from Georgia Tech." *Id.* ¶¶ 15-17.

"On the evening of September 16, 2017, [Scout] placed a call to the campus emergency number, '911'." Doc. 1 ¶ 18. They were experiencing a mental breakdown. *Id.* ¶ 19. They reported there was a suspicious person on campus, at the West Village section of the Georgia Tech campus. *Id.* ¶ 20. They said the person "might be 'drunk, or something,'" was "walking kind of slow" and "walking on the sidewalk." *Id.* ¶¶ 21-23. Scout described themself as the suspicious person in the 911 call. Specifically, they "described the person as a white male with long blonde hair dressed in a white T-shirt and jeans," and Scout's "appearance corresponded to the description he provided to the 911 dispatcher." *Id.* ¶¶ 24, 28.

---

[2] For purposes of this motion fact allegations of the complaint are accepted as true, legal conclusions and unwarranted deductions of fact are not. *See American Dental Ass'n. v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010); *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1260 (11th Cir. 2009). Fact allegations that conflict with the audio and video record referenced herein need not be accepted as true because that record is properly considered a part of the pleadings. *See infra* notes 3, 4 and accompanying text.

The complaint asserts that approximately four Georgia Tech Police Department (GTPD) officers responded to the 911 call. Doc. 1 ¶ 26. It describes Scout's encounter with GTPD officers as follows, the language here taken verbatim from the complaint:

> Each of the officers saw that Schultz was walking slowly. Each of the officers saw that Schultz was alone. Each of the officers saw that Schultz' arms were at his side. Officers drew their handguns and pointed them at Schultz. Schultz was barefoot. Schultz was verbally calm. Schultz did not state any threat to either of the officers. Schultz did not move his arms in a violent or aggressive manner. One officer shouted at Schultz, "Speak." Schultz did not immediately respond. One officer yelled at Schultz, asking for his name. Schultz did not immediately respond. Each of the officers was twenty or more feet in distance from Schultz's position. As Schultz moved slowly, officers adjusted their position to keep a safe distance from Schultz. Schultz paused and turned the position of his body so that he was facing several of the officers. Schultz slowly walked a few steps in the direction of the three officers. One of the three officers told Schultz not to move. At the time that he was told not to move, Schultz' arms remained at his side. At the time that he was told not to move, Schultz was facing in the direction of the three officers.

Doc. 1 ¶¶ 29-46.

> Each of the officers observed that Schultz was not acting rationally and was not responding rationally to officer commands. Schultz's actions as of the time that he was told not to move were consistent with a person who is experiencing a mental health crisis and were actions which a reasonably trained law enforcement officer would recognize as such. One or more of the four officers had received training designed to equip police officers with the observational skills to judge when a subject whom they are confronting is undergoing a mental health crisis or is otherwise engaging in behavior reflective of

- 5 -

> mental illness. The specialized training, Crisis Intervention Techniques, trains an officer in methods to de-escalate a potentially dangerous situation when dealing with a person undergoing a mental health crisis or engaging in behavior reflective of mental illness. Officer Beck was not one of those officers. Several of the officers at the scene remained calm and followed standard de-escalation techniques without initiating physical force directed at Scott Schultz. Unlike the other officers, Officer Beck did not de-escalate and instead used physical force. Immediately after Schultz was told not to move by one of his fellow officers, Beck shot Schultz – firing his weapon one time. Beck was the only officer to fire his weapon at Schultz.

Doc. 1 ¶¶ 47-55.

> At the time that Beck fired his weapon, Schultz had taken no physical or verbal action which constituted a threat to the physical safety of Beck or the other officers. At the time that Beck fired his weapon, Schultz had taken no physical or verbal action which constituted a threat to the physical safety of another person.

Doc. 1 ¶¶ 56-58.

## B. The 911 Call Audio Record, And The Video Record From Campus Security Cameras And Civilian Witness Cell Phones

The quoted language from the complaint in critical part misstates, or entirely omits, several key facts in Scout's 911 call and encounter with the GTPD officers. As previously mentioned, there is an audio recording of the 911 call. Campus security cameras created a video record from the time Scout placed the 911 call to the final moment of the encounter. And there is a cell phone video and audio recording of the final

minute and eight seconds before Officer Beck discharged his service weapon at an advancing Scout. The 911 audio record and video record are submitted with the motion to dismiss.[3] The Court may consider this material as part of the pleadings when deciding the motion because it is central to the asserted claims and its authenticity cannot be disputed.[4]

The audio and video recordings show the incident occurred on the Georgia Tech campus on 8th Street NW between McMillan Street NW and Curran Street NW. *See* Trammer Decl. ¶ 4 and Att. 1. Scout placed the 911 call from a sidewalk on the east end of the Eighth Street Apartments, a student residence hall. *Id.* GTPD officers approached Scout on the sidewalk on the southeast end of the Eighth Street Apartments. *Id.* Scout and the officers then moved west on 8th Street, and for purposes of orientation when viewing the video files as they move west on 8th Street the Eighth Street Apartments are on the north side of 8th street and the West Village Dining Commons, a student dining hall with

---

[3] *See* Exhibits A-C (Declarations of Frank Trammer, Jeff Hunnicutt, and William Smith). Exhibit D is a chronological summary of this audio and video record.

[4] *See, e.g., Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1054 n. 12 (11th Cir. 2015); *Speaker v. United States HHS CDC & Prevention*, 623 F.3d 1371, 1379 (11th Cir. 2010); *SFM Holdings Ltd. v. Banc of Am. Secs, LLC*, 600 F.3d 1334, 1337 (11th Cir. 2010); *Harris v. Ivax Corp.*, 182 F.3d 799, 802 n. 2 (11th Cir. 1999); *and see also In re ING Groep, N.V. ERISA Litig.*, 749 F. Supp.2d 1338, 1343-1344 (N.D. Ga. 2010) (Carnes, J.) ("When deciding a motion to dismiss, the Court must limit its consideration to well-pleaded factual allegations, judicially noticed matters, and documents central to or referred to in the complaint.") (citing *La Grasta v. First Union Sec., Inc*., 358 F.3d 840, 845 (11th Cir. 2004)). Such extrinsic matters control when they conflict with the complaint's allegations. *See Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1205-06 (11th Cir. 2007); *Associated Builders, Inc. v. Ala. Power Co.*, 505 F.2d 97, 100 (5th Cir. 1974).

study areas, and Curran Street Parking Deck, a student parking deck, are on the south side of 8th Street. *Id.*

As stated, the complaint describes Scout in this encounter as "walking slowly," "alone," "arms were at his side," "barefoot," "verbally calm," "did not state any threat" to officers, "did not move his arms in a violent or aggressive manner," "did not immediately respond" when asked to speak and when asked their name, "turned the position of his body so that he was facing" officers, and "slowly walked a few steps in the direction of officers." According to the complaint, Scout was told not to move, but then immediately Officer Beck shot them; and, according to the complaint, when Officer Beck discharged his weapon Scout had taken "no verbal or physical action which constituted a threat to the physical safety" of Officer Beck, other officers, or other persons. But these allegations are fundamentally at odds with the audio and video record.

Scout placed the 911 call at 11:16 p.m.. They said, "Hey, I'm over at West Village, it looks like there's, um there's somebody like, skulking around outside, looks like he's got, he's got a knife in his hand, I think he might have a gun on his hip." They said, it "looks like he might be drunk or something." They described the person as "he's got long blond hair, white T-shirt, jeans" and confirmed the person was a white male; they stated the person was "right across West Village on the sidewalk" "walking kind of slow"; Scout left the name Scott Schultz with the dispatcher, confirmed the phone number they

were calling from, and then stated "all right," with no apparent distress, when the dispatcher stated "we will be in route." Scout did not reveal on this call that they had described themself to the dispatcher. *See* Trammer Decl. Att. 1.

The following was captured by campus security cameras. After placing the 911 call, Scout paced, and waited, for six minutes on the sidewalk in front of the Eighth Street Apartments and across from the West Village Dining Commons and the Curran Street Parking Deck. At 11:22 p.m., when Scout was approached by the first responding officer, they reached behind their back, then brought their arms forward toward the approaching officer in such a manner as to cause the officer to immediately back away, with one hand raised and the other hand on the officer's hip/holster area. A second responding officer immediately drew his weapon and pointed it at Scout. Scout nonetheless advanced on these two officers, walking directly at the first responding officer from the place of the initial encounter down the sidewalk in front of the Eighth Street Apartments. Scout then paused, turned, and advanced on the second responding officer who at that time was positioned on 8th Street. Scout advanced on this officer fully across 8th Street until this officer was backed up against the Curran Street Parking Deck. Both of the retreating officers had their weapons drawn and pointed at Scout in this 2-minute time period of Scout's advance. The time now was 11:24 p.m.. Two additional officers had responded and taken positions on 8th Street. Scout turned and advanced with deliberate speed this

time toward one of these officers, and then paused. Importantly, in this advance, Scout can be seen holding an instrument in their right hand. *See* Trammer Decl. Att. 1.

What happened next was captured both by the campus security cameras and also by civilian witness cell phone video and audio. After Scout turned and advanced with apparent deliberate movement toward that officer who was positioned on 8th Street they were told clearly "<u>do</u> <u>not</u> <u>move</u>." This command was given 2 times clearly, loudly, and in a commanding and urgent tone immediately before the use of force. But after this command Scout advanced again on the officer and it was at that moment that the officer discharged his service weapon. As stated there is a cell phone video and audio recording of the final minute and eight seconds before Officer Beck discharged his service weapon at an advancing Scout. This record shows that Scout was asked multiple times in that last minute and eight seconds alone "what's your name," they were told clearly and loudly not less than 14 times "drop the knife" or "drop it," they were twice given the above-referenced command "<u>do</u> <u>not</u> <u>move</u>," but they ignored and refused all of those commands and instead advanced on the officers up to the final moment, with apparent deliberate movement. These are the words that were spoken in that last minute and eight seconds and as shown by the cell phone record:

> Come on man, drop the knife
> Come on, let's drop it
> Drop it

Shoot me
No, drop the knife
Drop the knife
Drop the knife
Drop the knife
Drop it
Drop the knife, man, come on

[holder of cell phone apparently speaking Russian]

Nobody wants to hurt you, drop the knife
Shoot me
Nobody wants to hurt you man
Drop the knife
Drop it

[inaudible]

What's going on, man
[inaudible]
What are we doing, what are we doing here
Drop it
SPEAK
DO NOT MOVE
What's your name
DO NOT MOVE
What's your name
[inaudible]
[inaudible] man, what's your name
What's your name
[inaudible]
Drop it
[gunshot]

*See* Trammer Decl. Att 1.

## ARGUMENT AND CITATION OF AUTHORITY

### A. The Complaint Does Not State A Fourth Amendment Claim Against Officer Beck, And Qualified Immunity Bars The Claim

"Qualified immunity protects government officials performing discretionary functions from suits in their individual capacities unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known." *Shaw v. City of Selma*, 884 F.3d 1093, 1098-1099 (11th Cir. 2018) (citing *Andujar v. Rodriguez*, 486 F.3d 1199, 1202 (11th Cir. 2007)). The complaint pleads that Officer Beck was acting within the scope of his discretionary authority when he shot Scout, Doc. 1 ¶ 8, so Plaintiffs must show that qualified immunity is inappropriate. *Id.* (citing *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002)). Plaintiffs must show both that the facts alleged "establish that a constitutional violation did occur," *id.* (citing *Smith v. LePage*, 834 F.3d 1285, 1291 (11th Cir. 2016)), and also that "law existing at the time the conduct occurred clearly established that the conduct violated the constitution. *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 232-36, 129 S. Ct. 808, 816-18 (2009)).

Claims of excessive force in this context are analyzed under the Fourth Amendment objective reasonableness standard. *See Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam) (citing *Tennessee* v. *Garner*, 471 U. S. 1, 105 S. Ct. 1694 (1985) and *Graham* v. *Connor*, 490 U. S. 386, 109 S. Ct. 1865 (1989)). "That means [courts] determine whether the seizure was "objectively reasonable ... from the

perspective of a reasonable officer on the scene." *Shaw*, 884 F.3d at 1099. In *Garner*, the Supreme Court held that the use of deadly force is not constitutionally unreasonable where "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." 471 U.S. at 11, 105 S. Ct. at 1701; *see also Carr v. Tatangelo*, 338 F.3d 1259, 1270 (11th Cir. 2003) (stating *Garner* permits "an officer to use deadly force to protect himself or others"). In *Graham*, the Court identified the factors to be considered in assessing reasonableness, and these are "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." 490 U.S. at 396, 109 S. Ct. at 1872; *see also Shaw*, 884 F.3d at 1099.

"The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Kisela*, 138 S. Ct. at 1152. And "the calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* Applying these concepts, the Eleventh Circuit has said that, in deciding whether an officer's use of force was objectively reasonable and whether the officer is entitled to qualified immunity, "we analyze the precise circumstances immediately preceding [the victim's] being shot."

*Carr*, 338 F.3d at 1270; *accord Menuel v. City of Atlanta*, 25 F.3d 990, 996-997 (11th

Cir. 1994) ("historical emphasis on the shortness of the legally relevant time period").

### 1.  There Was No Constitutional Violation

Officer Beck did not violate the Fourth Amendment. The law is settled that when a

suspect threatens an officer with a weapon, as Scout plainly did here, deadly force may

be used. *See Garner*, 471 U.S. at 11, 105 S. Ct. at 1701; *City & Cnty. of San Francisco v.*

*Sheehan*, 135 S. Ct. 1765, 1775 (2015) ("Nothing in the Fourth Amendment bar[s]

[officers] from protecting themselves, even [if] it mean[s] firing multiple rounds.");

*McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1246 (11th Cir. 2003)

(recognizing the Constitution permits the use of deadly force against a suspect who poses

an imminent threat of danger to a police officer or others).

Moreover, applying the *Graham* factors, the use of deadly force in the

circumstances here was objectively reasonable. Scout placed a 911 call in which they

identified themself as a person "skulking" on campus with a "knife in his hand" and

possibly a "gun on his hip." Scout gave a description of this person matching their own

appearance but did not inform the dispatcher that the description given was of themself.

When GTPD officers, including Officer Beck, responded to the 911 call, Scout advanced

repeatedly on the officers. Video shows that, in this advance, Scout was holding an

instrument in their right hand, and the officers were backing away with weapons drawn

and pointed at Scout. Under Georgia law, Scout's advance on the officers with this instrument constituted several serious crimes, including aggravated assault, aggravated assault on a public safety officer and, at least from the moment Scout failed to respond to officer commands "drop the knife" and "do not move," felony obstruction of an officer. *See* O.C.G.A. §§ 16-5-21(a)(2), (c); *and see* O.C.G.A. § 16-10-24(b). Thus, the first two *Graham* factors – the severity of the crime and whether the suspect poses an immediate threat to the safety of the officers or others – weigh in favor of the use of force.[5]

The third *Graham* factor – whether the suspect is actively resisting arrest or attempting to evade arrest by flight – also supports the use of force. Scout did not respond when asked multiple times "what's your name," they ignored and refused not less than 14 commands to "drop the knife" or "drop it," they ignored and refused not less than 2 clear, loud, and urgent commands "do not move," and instead they advanced on the officers up to the final moment, with apparent deliberate movement. Scout presented no option to responding officers other than the option to use force to stop their advance with a weapon or instrument that if used offensively could inflict serious bodily harm or even death. No Fourth Amendment claim in stated in these circumstances.

---

[5] It is also relevant that this incident occurred on an active college campus with bystanders in close proximity because an officer's duty is to protect self and others.

### 2.  Qualified Immunity Bars The Fourth Amendment Claim

The Supreme Court has said that "specificity is especially important in the Fourth Amendment context, where … it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Kisela*, 138 S. Ct. at 1152-1153 (quoting *Mullenix* v. *Luna*, 136 S. Ct. 305 (2015) (per curiam)). "Use of excessive force is an area of the law 'in which the result depends very much on the facts of each case,' and thus police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue." *Id.* In the Eleventh Circuit, only United States Supreme Court, Eleventh Circuit, and Georgia Supreme Court cases can clearly establish the contours of federal law. *See Jenkins v. Talladega City Bd. of Educ.*, 115 F.3d 821, 827 (11th Cir. 1997) (en banc).

Instead of clearly establishing the law against Officer Beck, the case law indicates that his use of force was not unreasonable in the circumstances. Several of the cases cited above are instructive. In *Kisela*, three officers responded to a 911 call in which it was reported that a woman (Hughes) was hacking a tree with a kitchen knife. The officers were told that Hughes was acting erratically. When the officers arrived they were separated from Hughes by a chain link fence, but there was another person inside the fenced area. All three officers drew their guns and told Hughes at least twice to drop the knife. Hughes appeared calm, but she did not acknowledge the officers' presence or drop

the knife. One officer dropped to the ground and shot her four times through the fence. 138 S. Ct. at 1151. The Supreme Court said that "this is far from an obvious case in which any competent officer would have known that shooting Hughes to protect [the other person] would violate the Fourth Amendment." *Id*. at 1153. The Court reversed the Ninth Circuit's finding of a Fourth Amendment violation on these facts. *Id.* at 1155.

The most analogous Eleventh Circuit precedents also favor Officer Beck. *Shaw* is instructive. Selma police received an emergency call about a disturbance at a restaurant. Shaw, a 74-year-old mentally ill man, had attempted to enter the restaurant but was turned away by its manager. Dispatch warned the officers that Shaw previously had been at the restaurant "armed with a knife." Three officers responded, finding Shaw inside an abandoned laundromat down the street. One officer entered to ask Shaw to come out and speak with him, but Shaw refused. Shaw then bent down and picked up a hatchet. The officer drew his gun in response and started backing out of the building. Shaw, holding the hatchet, followed. Once outside, the officers told Shaw firmly and clearly several times to "put the axe down." Shaw refused and instead walked slowly down the street in the direction of the restaurant. The officers followed him with their weapons drawn, repeatedly instructing him to put down the hatchet. At one point, Shaw turned and started to move slowly toward one of the officers, shouting "Shoot it! Shoot it!" Shaw then shouted "Shoot it!" one more time, and the officer fired a single shot, killing him. 884

F.3d at 1096-1098. The Eleventh Circuit held that this use of force was reasonable, and

further that qualified immunity barred the Fourth Amendment claim. *Id.* at 1100-1101.

The court cited several prior cases as supportive of this conclusion. *See id.*[6]

The foregoing analysis is not altered by the complaint's allegation that Scout's

"actions … were consistent with a person who is experiencing a mental health crisis."

*Sheehan* is instructive. There officers responded to a call regarding a disturbance at a

group home for the mentally ill. When the officers first entered Sheehan's room she

yelled at them to get out and threatened them with a kitchen knife, and so the officers

retreated and Sheehan closed the door. Rather than wait for backup, and rather than

taking another course of action to accommodate Sheehan's disability, the officers entered

---

[6] *Shaw* was decided in 2018 but involved a 2013 incident, so it is relevant in this analysis.
The cases cited in *Shaw* were *Singletary v. Vargas*, 804 F.3d 1174, 1183 (11th Cir. 2015)
("[T]he law does not require officers in a tense and dangerous situation to wait until the
moment a suspect uses a deadly weapon to act to stop the suspect.") (quoting *Long v.
Slaton*, 508 F.3d 576, 581 (11th Cir. 2007)); *Jean-Baptiste v. Gutierrez*, 627 F.3d 816,
821 (11th Cir. 2010) ("Regardless of whether [the suspect] had drawn his gun, [his] gun
was available for ready use, and [the officer] was not required to wait and hope for the
best [before using deadly force to stop him].*"); *Garczynski v. Bradshaw*, 573 F.3d 1158,
1169 (11th Cir. 2009) ("[W]here orders to drop [a] weapon have gone unheeded, an
officer is not required to wait until an armed and dangerous felon has drawn a bead on the
officer or others before using deadly force."); *Smith*, 834 F.3d at 1294-95 (concluding
that it was reasonable for officers to believe that a suspect who was carrying a knife and
refused to comply with orders to disarm himself posed an immediate threat to the
officers' safety); *and Blanford v. Sacramento County*, 406 F.3d 1110, 1116-19 (9th Cir.
2005) (holding that officers did not use excessive force in shooting a suspect carrying a
sword after the suspect, who was behaving erratically, refused to comply with orders to
drop the sword, even though he had not actually threatened anyone with the weapon).

the room a second time. Sheehan was there with the knife, and she was peppered sprayed and shot twice when she did not drop the knife. 135 S. Ct. at 1769-1771. The Supreme Court addressed the question "whether, despite these dangerous circumstances, the officers violated the Fourth Amendment when they decided to reopen Sheehan's door rather than attempting to accommodate her disability." Because such a Fourth Amendment right, even assuming it exists, was not clearly established, the Court said that qualified immunity barred the Fourth Amendment claim. *Id.* at 1775.[7]

### B. The Complaint Does Not State A Claim Under Title II Of The ADA Or Section 504 Of The Rehabilitation Act Against The Board Of Regents

The complaint does not state a claim against the Board of Regents under Title II of the ADA or section 504 of the Rehabilitation Act.

#### 1. Title II And Section 504 Do Not Apply To Police Arrests Or In-The-Field Encounters With Violent Or Potentially Violent Persons

Title II of the ADA and section 504 of the Rehabilitation Act do not apply here. Congress did not intend for these statutes to apply to restrict peace officers in their on-the-street responses to reported incidents or disturbances; at least, it did not intend to place restrictions on officers before the point in time when they have secured the scene

---

[7] *Sheehan* involved a 2008 incident and was decided in 2015, so it is relevant precedent in assessing Officer Beck's conduct in September 2017. Defendants are aware of no post-*Sheehan* precedent which alters this analysis. No case law would have instructed Officer Beck to modify his otherwise objectively reasonable response to Scout's actions based on an alleged perceived mental health crisis.

and ensured that there is no threat to human life. The Eleventh Circuit has not directly answered the question of whether these statutes apply to such encounters.[8] *See Bircoll v. Miami-Dade County*, 480 F.3d 1072 (11th Cir. 2007); *Osorio v. Miami-Dade County*, 2018 U.S. App. LEXIS 8567, **2 (11th Cir. April 2, 2018) (per curiam). But other circuits have, and at least one circuit has held that the statutes do not apply in this context. *See Hainze v. Richards*, 207 F.3d 795, 801 (5th Cir. 2000) ("Title II does not apply to an officer's on-the-street responses to reported disturbances or other similar incidents, whether or not those calls involve subjects with mental disabilities, prior to the officer's securing the scene and ensuring that there is no threat to human life."). Even if Title II and section 504 did apply, the claims would fail for the reasons set forth below.

## 2.  The Eleventh Amendment Bars The ADA Claim

The Constitution "recognizes the States as sovereign entities" a basic attribute of which is immunity from private suits. *Alden v. Maine*, 527 U.S. 706, 713 (1999). The Eleventh Amendment bars suit against a state or one of its agencies, absent a waiver by the state or a valid congressional override, when the state is the real party in interest or when any monetary recovery would be paid from state funds. *Id.* at 754-757. And the Supreme Court has ruled that the ADA abrogates Eleventh Amendment immunity only when the challenged conduct amounts to an independent constitutional violation. *See*

---

[8] The Supreme Court accepted certiorari on this question in *Sheehan* but did not decide the issue. 135 S. Ct. at 1769-1774 (majority opinion), 1778-1180 (Scalia, dissenting).

*United States v. Georgia*, 246 U.S. 151, 159 (2006). As previously shown, there is no

Fourth Amendment violation, so the Title II claim is barred.

### 3. The Complaint Does Not Plausibly Show Discrimination *On The Basis Of Disability*, And Does Not Plead *Deliberate Indifference* As Required In Order To Recover Compensatory Damages

Title II provides, "[s]ubject to the provisions of this title, no qualified individual

with a disability shall, by reason of such disability, be excluded from participation in or

be denied the benefits of the services, programs, or activities of a public entity, or be

subjected to discrimination by any such entity." 42 U.S.C § 12132. Section 504 provides,

in relevant part, "[n]o otherwise qualified individual with a disability … shall, solely by

reason of her or his disability, be excluded from the participation in, be denied the

benefits of, or be subjected to discrimination under any program or activity receiving

Federal financial assistance." 29 U.S.C. § 794(a). The Eleventh Circuit has said that these

statutes are "pretty much identical," and "[g]iven the textual similarities between the two

statutes, the same standards govern claims under both." *Silberman v. Miami Dade

Transit*, 927 F.3d 1123, 1133-1134 (11th Cir. 2019).

To prevail on a claim under Title II or section 504, a plaintiff must plead, and

ultimately prove: (1) they are a qualified individual with a disability; (2) they were either

excluded from participation in or denied the benefits of a public entity's services,

programs, or activities, or were otherwise discriminated against by the public entity; and

(3) the exclusion, denial of benefit, or discrimination was by reason of their disability. *Silberman*, 927 F.3d at 1134 (citing *Bircoll v. Miami-Dade Cty.*, 480 F.3d 1072, 1083 (11th Cir. 2007)). Normally, "proof of a Title II or § 504 violation entitles a plaintiff only to injunctive relief." *Id.* (citing *Silva v. Baptist Health S. Fla., Inc.*, 856 F.3d 824, 831 (11th Cir. 2017)). In order to recover compensatory damages,[9] the plaintiff must plead and prove that the entity engaged in intentional discrimination, which requires a showing of deliberate indifference. *Id.* at 1134 (citing *Liese v. Indian River Cty. Hosp. Dist.*, 701 F.3d 334, 348 (11th Cir. 2012). This is a high standard:

> "Deliberate indifference," we have said, is an "exacting standard." *J.S*, 877 F.3d at 987.[10] It requires proof that "the defendant knew that harm to a federally protected right was substantially likely and ... failed to act on that likelihood." *Liese*, 701 F.3d at 344 (citation omitted). Moreover, in order to hold a government entity liable, the plaintiff must demonstrate that an "official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the [entity's] behalf" had "actual knowledge of discrimination in the [entity's] programs and fail[ed] adequately to respond." *Id.* at 349 (quoting *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290, 118 S. Ct. 1989, 141 L. Ed. 2d 277 (1998)). To qualify, that "official" must be "high enough up the chain-of-command that his [or her] acts constitute an official decision by the [entity] not to remedy the misconduct." *J.S.*, 877 F.3d at 987 (internal quotation marks omitted).

---

[9] Punitive damages are not available under the ADA or the Rehabilitation Act. *See Barnes v. Gorman*, 536 U.S. 181, 187-188 (2002).

[10] *J.S. v. Houston Cty. Bd. of Educ.*, 877 F.3d 979 (11th Cir. 2017).

- 22 -

927 F.3d at 1134.

The complaint fails to meet at least two of the above requirements: (1) exclusion, denial of benefit, or discrimination *by reason of disability*; and (2) intentional discrimination, which again means *deliberate indifference*.[11] With respect to the "by reason of" requirement, Scout was shot after advancing on officers with an instrument in an unlawful and threatening manner and after refusing multiple officer instructions to "drop the knife" and "do not move." In other words, the use of force here was not "by reason of" Scout's disability; instead, it resulted from Scout's unlawful and threatening conduct. Courts have rejected Title II claims when the "by reason of" requirement is not met in this way. *See Hoolihan v. Clayton Cnty, Ga.*, 2012 U.S. Dist. LEXIS 193704, *24-26 (N.D. Ga. March 12, 2012) (Jones, J.) (finding that it was the plaintiff's resistance to officers, rather than county's alleged failure to train its officers to accommodate individuals with disabilities, that led to his arrest and injuries, and rejecting Title II claim on this basis) (citing and discussing *Sanders v. City of Minneapolis*, 474 F.3d 523, 527-528 (8th Cir. 2007) (finding that it was not the city's alleged failure to train its officers,

---

[11] The theory of the Title II and section 504 claims is that Georgia Tech failed to accommodate Scout's mental health disability. But unlike Titles I and III, Title II does not contain an accommodation or modification requirement. *See Bircoll*, 480 F.3d at 1082 n. 13. To the extent that implementing regulations require accommodation, *see id.*, they exceed statutory authority and are not enforceable. *See Shotz v. City of Plantation*, 344 F.3d 1161, 1178-1179 (11th Cir. 2003). In any event, no claim is stated for the reasons stated in the text.

but the apparent attempt to run over the officers, that precipitated a shooting, and

rejecting Title II claim on this basis). The complaint fails the "by reason of" requirement.

The complaint also fails to plead intentional discrimination – that is, deliberate

indifference of a responsible official. Two essential elements are missing here. First, the

complaint does not identify a responsible official who is alleged to have been on notice of

discrimination in Georgia Tech's programs or services and to have failed to act to correct

such discrimination. That is a fatal omission and it requires dismissal of the Title II and

section 504 claims. *See Silberman*, 927 F.3d at 1134; *and see also Osorio*, 2018 U.S.

App. LEXIS 8567, **2-3 (affirming dismissal of Title II claim where the plaintiff "pled

no facts to support the … existence of a Miami-Dade official who had actual knowledge

of the police's discrimination of disabled individuals and failed to act accordingly").

Second, the complaint does not plead deliberate indifference and instead travels

under a negligence theory. The complaint alleges that, at the time of Scout's shooting,

"the majority of Georgia Tech's police officers had not completed the Crisis Intervention

Training," the steps taken by Georgia Tech to train its officers were insufficient to

prevent Scout's death, the failure to properly train its police officers "was the result of

inaction and decisional failures which occurred well in advance of [Scout's] death," and

"the need for such training was well known within the law enforcement community."

Doc. 1 ¶¶ 58-61. The complaint also alleges that "studies published" years before Scout's

death showed that half of all fatal police encounters "involve persons with psychiatric disorders." *Id.* ¶ 62. The problem with these allegations is that they do not show actual disability discrimination of which a Georgia Tech official was aware. In other words, they do not show a pattern of past incidents similar to what is alleged in this case. Absent prior incidents, there is no notice of a need for more or better training and no notice of a deficiency in the programs or services. *See Liese*, 701 F.3d at 344-348 (deliberate indifference means "deliberate choice"); *Silberman*, 927 F.3d at 1136 (deliberate indifference means an officer "knows that discrimination has taken place"); *J.S.*, 877 F.3d at 987 (deliberate indifference means failure to respond to "known circumstances" and "actual knowledge" of "discrimination in the organization's programs"); *Haberle v. Troxell*, 885 F.3d 171, (3rd Cir. 2018) (deliberate indifference means "failure to adequately respond to a pattern of past occurrences of injuries like the plaintiff's"); *and see Piazza v. Jefferson Cty.*, 923 F.3d 947, 957 (11th Cir. 2019) (in section 1983 context, "deliberate indifference" generally requires "multiple incidents"). Deliberate indifference is not pleaded, and this also is fatal to the Title II and section 504 claims.

## CONCLUSION

Defendants ask that the Court grant this motion and dismiss the complaint and the claims asserted against them for the reasons stated herein.

Respectfully submitted,

CHRISTOPHER M. CARR 112505
Attorney General

KATHLEEN M. PACIOUS      558555
Deputy Attorney General

s/ Roger A. Chalmers         118720
ROGER A. CHALMERS
Senior Assistant Attorney General

LAURA L. LONES             456778
Senior Assistant Attorney General

PLEASE ADDRESS ALL
COMMUNICATIONS TO:
Roger A. Chalmers
State Law Department
40 Capitol Square SW
Atlanta, GA  30334
Tel: (404) 463-8850
Fax: (404) 651-5304
Email: rchalmers@law.ga.gov

**<u>CERTIFICATE PURSUANT TO LOCAL RULE 7.1.D</u>**

I certify that the foregoing brief conforms to the requirements of L.R. 5.1C. The

brief is prepared in 14 point Times New Roman font.

<u>s/ Roger A. Chalmers</u>

**<u>CERTIFICATE OF SERVICE</u>**

I certify that I have this day served the foregoing pleading with the Clerk of Court

using the CM/ECF system which will automatically send email notification of such filing

to the following attorneys of record:

George Brian Spears
Larry Christopher Stewart

I further certify that I have mailed by United States Postal Service the document to

the following non-CM/ECF participants: NONE.

This 9th day of December, 2019.

<u>s/ Roger A. Chalmers</u>