IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

THE ESTATE OF SCOUT SCHULTZ,  )
WILLIAM SCHULTZ and LYNNE  )
SCHULTZ,  )
    )
      Plaintiffs,  )
    )
v.  )      CIVIL ACTION FILE NO.
    )      1:19-cv-04083-JPB
BOARD OF REGENTS OF THE  )
UNIVERSITY OF GEORGIA by and  )
on behalf of GEORGIA INSTITUTE  )
OF TECHNOLOGY and TYLER  )
AUSTIN BECK,  )
    )
      Defendants.  )

## PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

## I.    INTRODUCTION

The above-captioned civil action arises out of the shooting death of Scott Schultz ("Schultz"), a mentally-ill undergraduate engineering student enrolled at the Georgia Institute of Technology ("Georgia Tech"), which shooting occurred on Georgia Tech's campus on September 16, 2017 as a result of an unreasonable and excessive use of deadly force by Defendant Tyler Austin Beck ("Beck"), a law enforcement officer employed by Georgia Tech. The factual allegations in the complaint plausibly assert that Beck used excessive deadly force in a non-deadly

situation involving no imminent threat of serious bodily harm in violation of Schultz's clearly-established Fourth Amendment rights.[1] Qualified immunity is thus inappropriate at this stage.

The facts alleged in the complaint also plausibly support plaintiffs' claim against the Board of Regents of the University of Georgia for its violation of the Americans with Disabilities Act and of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. 794, which deprived Scott Schultz of his rights under said statutes. Plaintiffs respectfully submit that dismissal under Rule 12(b)(6) is inappropriate.

## II.   <u>SUMMARY OF FACTUAL ALLEGATIONS</u>

Like many undergraduate college students enrolled in universities across the nation,[2] Schultz suffered from mental illness and on the evening of September 16, 2017, was experiencing a mental health crisis. (Doc. 1, ¶ 15). Schultz called 911 that night and reported that there was a suspicious person who was possibly drunk who was "walking kind of slow" on the sidewalk of the West Village on

---

[1] *Clawson v. Rigney,* 777 F. App'x 381, 385 (11th Cir. 2019) (denying qualified immunity to officer on summary judgment affirmed where, despite evidence that deceased possessed a knife, the circumstances were not deadly and officer was thus not entitled to use deadly force); *Calderin v. Miami–Dade Police Dep't,* 600 Fed. Appx. 691, 696 (11th Cir. 2015) (denying qualified immunity for officer who shot suspect who did not make any threatening movements towards the police despite refusal to comply with commands to drop kitchen knife).

[2] *Record Numbers of College Students Are Seeking Treatment for Depression and Anxiety — But Schools Can't Keep Up,* TIME MAGAZINE, Katie Reilly, March 19, 2018, https://time.com/5190291/anxiety-depression-college-university-students/

Georgia Tech's campus. (Doc. 1, ¶¶ 20-23). Schultz provided the 911 dispatcher with his name as well as a description of the suspicious person which matched his own physical description. (Doc. 1, ¶¶ 24-25).  Several Georgia Tech officers were dispatched in response to Schultz's 911 call. (Doc. 1, ¶ 26).

Although Schultz reported to the 911 dispatcher that the suspect may be in possession of a knife, it is not alleged that Schultz was holding a knife or any other object when the officers arrived at the scene. Nor are there any allegations in the complaint indicating what, if any, information from Schultz's 911 call was conveyed to the officers by dispatch. Likewise, it is not alleged and indeed, without discovery, it is unknown what Beck or any of the other officers in fact heard or observed at the scene. Moreover, it is not alleged that Beck or any of the other officers had prior knowledge of any information to reasonably indicate that Schultz had a violent history of threatening or causing physical harm of any kind, whether with a potentially dangerous object or otherwise. Although defendants attached extrinsic evidence as exhibits to their motion to dismiss, to which plaintiffs object for the reasons set forth in their written objections being filed contemporaneously herewith, the exhibits on which defendants rely do not establish any of these critical facts. Thus, at this juncture, even if the court were to consider any of defendants' extrinsic evidence over plaintiffs' objections, it cannot be assumed that Schultz was holding any object, that any of the officers observed

or otherwise had any reasonable basis to believe that Schultz was holding any object at the scene, much less a potentially dangerous object, or that any of the officers had prior knowledge of any information to reasonably believe that Schultz was potentially dangerous.[3]

When the officers first encountered Schultz at the scene and at every point thereafter, Schultz was calm and was slowly walking around alone with both arms by his sides. (Doc. 1, ¶¶ 29-31, 34-36). Although Schultz was experiencing a mental health crisis and thus did not respond to the officers' verbal commands, he remained passive at all times and did not take any action which could have reasonably been perceived as physically threatening, aggressive, or violent. (Doc. 1, ¶¶ 29-31, 34-40). At no point during the encounter did Schultz raise or move his arms or hands away from the sides of his body to brandish any object in a threatening or aggressive manner. (Doc. 1, ¶¶ 36, 45, 56-57). Nor did Schultz at any point yell or verbally threaten physical harm against any person, whether with an object or otherwise. (Doc. 1, ¶ 35). Rather, at all times throughout the encounter, Schultz remained calm while slowly walking around with both arms by his sides, and did not exhibit any violent, aggressive, or threatening behavior whatsoever.

---

[3] Although an unidentified officer can be heard on video footage telling Schultz to "drop the knife," discovery is needed to determine which of the officers made this statement and whether Beck heard any such statement at the scene.

Given Schultz's slow and steady walking pace, the officers easily adjusted their respective positions and remained at least 20 feet away from Schultz as he walked around, well out of his arm's reach and without any risk of harm. (Doc. 1, ¶ 41). At no point during the encounter did Schultz run or aggressively lunge toward any of the officers to close the distance in between, and did not otherwise take any action reasonably indicating that he would attack. (Doc. 1, ¶¶ 36, 45, 56-57). Nor did Schultz actively resist or attempt to flee. (Doc. 1, ¶¶ 36, 45, 56-57).

At some point, with both arms remaining by his side, and without exhibiting any violent or threatening behavior, Schultz slowly began walking toward three officers who were standing together at least 20 feet away from him, at which point an unidentified officer commanded Schultz not to move. (Doc. 1, ¶¶ 41-44). In response, Schultz calmly and quietly stood in position and maintained both arms by his sides. (Doc. 1, ¶¶ 41-44). Schultz did not yell or threaten any of the officers, did not run or lunge toward any of them, and did not move or raise his arms from his sides. Simply put, Schultz had taken no physically violent or aggressive action which reasonably could have been perceived as threatening harm against any person at the scene. Nevertheless, when Schultz slowly took a few steps forward with both arms remaining by his sides and remaining over 20 feet away and well out of arm's reach of any person, Beck immediately fired his weapon and shot

Schultz in his torso. (Doc. 1, ¶¶ 45, 54, 56-57, 65). Schultz died from the single deadly gunshot wound inflicted by Beck. (Doc. 1, ¶ 66).

## III.   ARGUMENT AND CITATION TO AUTHORITY

### A. BECK VIOLATED CLEARLY ESTABLISHED LAW BY USING DEADLY FORCE AND IS THUS NOT ENTITLED TO QUALIFIED IMMUNITY.

"At the motion to dismiss stage, 'all-well pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff.'"[4] Thus, at this juncture, the Court may only consider the four corners of the complaint[5] to determine whether Beck was confronted with a deadly situation justifying the use of deadly force, or whether Beck was confronted with a non-deadly situation and "without provocation shot at a nondangerous suspect" thereby violating clearly established law.[6]

---

[4] *Pickens v. Lofton*, 2018 WL 4907775 (N.D. Ga., 2018).

[5] "The scope of the review must be limited to the four corners of the complaint. While there may be a dispute as to whether the alleged facts are the actual facts, in reviewing the grant of a motion to dismiss, we are required to accept the allegations in the complaint as true." *St. George v. Pinellas Cty.*, 285 F.3d 1334, 1337 (11th Cir. 2002).

[6] *Lundgren v. McDaniel*, 814 F.2d 600, 603 (11th Cir. 1987) (denying qualified immunity where it was disputed whether the victim threatened the officers with a gun, since "[t]he jury could have reasonably believed that the officers were neither threatened by a weapon, nor appeared to be threatened by a weapon, nor were fired upon, but rather that the officers without provocation shot at a nondangerous suspect"); *Perez*, 809 F.3d at 1220–22 (holding that the officer was not entitled to qualified immunity where he shot the victim who had a gun in his waistband, since the presence of a gun "is merely one element in the

To survive dismissal, the complaint must "include the specific, non-conclusory allegations of fact that will enable the district court to determine that those facts, if proved, will overcome the defense of qualified immunity."[7]  To overcome qualified immunity, the court "must conclude both that the allegations in the complaint, accepted as true, establish a constitutional violation and that the constitutional violation was 'clearly established.'"[8] "As a 'threshold question,' a court must ask, '[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?'"[9] "If a constitutional right would have been violated under the plaintiff's version of the facts, the court must then determine 'whether the right was clearly established.'"[10] The complaint plausibly alleges that Beck's use of deadly force violated the Fourth Amendment and clearly established law. Qualified immunity is thus inappropriate.[11]

---

[reasonableness] calculus; the ultimate determination depends on the risk presented, evaluating the totality of the circumstances surrounding the weapon.... Our case law clearly establishes that the use of force against an arrestee who, inter alia, is not a threat, has not exhibited aggressive behavior, and has not actively resisted arrest is excessive."); *Clawson*, 777 F. App'x at 386; *Brown v. Newton County Sheriff's Office,* 273 F. Supp. 3d 1142, 1157 (N.D. Ga., 2017).

[7] *Dalrymple v. Reno,* 334 F.3d 991, 996 (11th Cir. ,2003).

[8] *Sebastian v. Ortiz,* 918 F.3d 1301, 1307 (11th Cir. 2019).

[9] *Artiga v. Garcia*, 316 F. App'x 847, 850 (11th Cir. 2008).

[10] *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002).

[11] *Rogers v. City of Atlanta,* 214 F. Supp. 3d 1314, 1318 (N.D.Ga., 2016);

### 1)  **Beck violated Schultz's Fourth Amendment Rights.**

To determine whether Beck's use of deadly force was objectively reasonable and justified under the Fourth Amendment, courts "must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion."[12] Specifically, in cases challenging an officer's use of force, the court must "balance the risk of bodily harm to the suspect against the gravity of the threat the officer sought to eliminate,"[13] and must do so from the perspective of "'a reasonable officer possessing the same particularized information as the subject officer."[14] As explained by the United States Supreme Court, "the balancing of competing interests" is "the key principle of the Fourth Amendment,"[15] which standard "depends on whether the 'suspect poses a threat of serious physical harm,' with emphasis on the level and immediacy of that threat."[16]

---

*Benjamin v. Thomas*, 2016 WL 5394118 (N.D. Ga., 2016) (denying qualified immunity on 12(b)(6) motion to dismiss because complaint sufficiently alleged that officer used excessive force against a suspect who did not pose an immediate threat).

[12] *Tennessee v. Garner,* 471 U.S. 1, 8 (1985).

[13] *McCullough v. Antolini,* 559 F.3d 1201, 1206 (11th Cir. 2009) (citing *Scott v. Harris,* 550 U.S. 372 (2007)).

[14] *Penley v. Eslinger,* 605 F.3d 843, 852 (11th Cir. 2010).

[15] *Garner,* 471 U.S. at 8.

[16] *Perez v. Suszczynski,* 809 F.3d 1213, 1220 (11th Cir. 2016).

The governmental intrusion at issue in this case was severe — Schultz died from Beck's single gunshot to his torso.[17] Thus, there must exist a significant governmental interest — an imminent threat of serious bodily harm — to justify Beck's decision to resort to deadly force.[18] "When determining the government's interest, [the court] must consider factors that include 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'"[19] As explained by the United States Supreme Court in *Tennessee v. Garner*, a police officer is not authorized to use deadly force unless "the officer (1) has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others or that he has committed a crime involving the infliction or threatened infliction of serious physical harm; (2) reasonably believes that the use of deadly force was necessary to prevent escape; and (3) has given some warning about the possible use of deadly force, if feasible."[20]

---

[17] *Garner*, 471 U.S. at 9 ("The intrusiveness of a seizure by means of deadly force is unmatched. The suspect's fundamental interest in his own life need not be elaborated upon.").

[18] *Id.*

[19] *Calderin*, 600 F. App'x at 694 (internal citations omitted); *Morton v. Kirkwood,* 707 F.3d 1276, 1281 (11th Cir. 2013).

[20] *Morton,* 707 F.3d at 1281 (internal citations and quotation marks omitted); *McCullough,* 559 F.3d at 1206; *Vaughan v. Cox,* 343 F.3d 1323, 1329–30 (11th Cir. 2003); *Garner,* 471 U.S. at 9;, *Penley,* 605 F.3d at 854 ("For over twenty years,

Because the complaint does not allege that Schultz was holding any object whatsoever, for purposes of defendants' motion to dismiss, the court cannot assume that Schultz was in possession of any potentially dangerous object. Even if discovery ultimately reveals that Beck believed Schultz was holding *something*, "the mere presence of [even] a gun or other weapon is not enough to warrant the exercise of deadly force and shield an officer from suit. Where the weapon was, what type of weapon it was, and what was happening with the weapon are all inquiries crucial to the reasonableness determination."[21] These critical inquiries must be further developed in discovery and cannot presently be answered based on the current pleadings.

### a.  Schultz was not suspected of committing a serious crime.

Defendants inaccurately assert that Beck had probable cause to believe that Schultz committed aggravated assault and felony obstruction. (Doc. 11-1, p. 3). Felony obstruction requires "evidence that the defendant offered or did violence, such as punching, choking, kicking, or biting, to the arresting officers."[22] No such

_____

*Tennessee v. Garner* has guided courts' Fourth Amendment reasonableness analysis where officers used lethal force.").

[21] *Perez*, 809 F.3d at 1220.

[22] *Hoglen v. State*, 336 Ga. App. 471, 475–76 (2016) (citing *McMullen v. State*, 325 Ga. App. 757, 758 (2014) (defendant who jumped on officer's back, choked him, and struck him twice in the face and once in the neck was guilty of felony obstruction); *Arnold v. State*, 249 Ga. App. 156, 159 (2001) (evidence was sufficient

allegations are set forth in the complaint. Likewise, it cannot be reasonably inferred from the complaint that Schultz committed an aggravated assault. Schultz did not "commit an act" to place the officers in reasonable apprehension of receiving a violent injury, nor did he in fact inflict any violent injury on any of the officers.[23] At worst, Schultz's failure or inability to comply with the officers' verbal commands while slowly and passively walking around with both arms by his sides, amounts to misdemeanor obstruction without violence,[24] "a crime of 'minor severity' for which less force is generally appropriate."[25]

### b.  Schultz did not pose an immediate threat of serious injury.

Although Schultz was walking forward when he was shot in the torso, no reasonable officer could have believed that he posed any threat of serious injury, much less an imminent threat. Schultz was calm and only took a few steps forward, slowly with both arms by his sides, and remained well out of arm's reach and striking distance of Beck or any other person when he was shot. Schultz had

---

to sustain obstruction conviction where defendant grew belligerent after being placed in patrol car, began kicking window, and threatened to "pop a cap in [the officer's] ass" if he saw him again); O.C.G.A. § 16-10-24(b).

[23] *In re C.S.,* 251 Ga. App. 411, 412 (2001) (holding that evidence of suspect's refusal to obey verbal commands to drop knife insufficient to support conviction for aggravated assault because he had not "committed an act or given a demonstration of violence"). O.C.G.A. § 16-5-20(a); O.C.G.A. § 16-5-21.

[24] *In re C.S.,* 251 Ga. App. at 412 (2001).

[25] *Reese v. Herbert,* 527 F.3d 1253, 1274 (11th Cir. 2008).

not at any point prior taken any action to reasonably indicate that he would suddenly run or lunge toward the officers to physically attack. Even if discovery were to reveal that Schultz was holding a potentially dangerous object and that Beck had knowledge of this fact, unlike cases finding an imminent deadly threat, Schultz did not brandish or point any such object in the direction of any person,[26] nor did he at any point come within reasonable striking distance of any person, much less "while yelling and waving his arms."[27] Schultz remained calm and passive, and did not at any point move his arms from the sides of his body. Thus, based on the facts alleged in the complaint, Beck was confronted with a non-deadly situation which did not involve any immediate threat of serious harm.[28] Simply put, Beck "was not entitled to use deadly force against [Schultz], who was not suspected of committing any [serious] crime, was not taking any actions suggesting that he would attack an officer, and was not armed with a firearm."[29]

---

[26] *Hunter v. City of Leeds,* 941 F.3d 1265, 1279 (11th Cir. 2019) (granting qualified immunity for use of deadly force against suspect who pointed gun at officer and refused to drop it); *Penley,* 605 F.3d at 852 (same).

[27] *Benjamin v. Thomas,* 766 Fed. Appx. 834, 839 (11th Cir. 2019).

[28] *Hunter,* 941 F.3d at 1279; *Kinlocke v. Benton*, 257 F. Supp. 3d 1368, 1379-80 (N.D. Ga. 2017) ("Given the apparently low-stakes nature of the encounter—the minor violation, the absence of a threat of violence, and the passive nature of the attempted flight—and the Eleventh Circuit's prior holdings in taser cases, Kinlocke has plausibly alleged that Benton violated his clearly established right to be free from excessive force.").

[29] *Clawson,* 777 F. App'x at 386 (denying qualified immunity to officer who

### c. **Schultz did not actively resist or attempt to flee.**

There are no facts alleged in the complaint indicating that Schultz actively resisted or attempted to flee. Because Schultz did not take any physically violent, aggressive, or threatening action against any of the officers, his passive non-compliance with the officers' verbal commands could only support a charge for misdemeanor obstruction without violence, a minor offense which the Eleventh Circuit confirmed does not constitute "active resistance" to arrest.[30] As explained by the Eleventh Circuit, "resisting arrest without force does not connote a level of dangerousness that would justify a greater use of force."[31] Likewise, because there is no allegation that Schultz attempted to flee, Beck could not have reasonably believed that he needed to shoot Schultz to prevent his escape.[32]

---

shot suspect who disobeyed multiple commands to drop his knife but who never made any "threatening gesture" with the knife, and distinguishing between potential dangers of a gun and a knife); *Lundgren v. McDaniel,* 814 F.2d 600, 602 (11th Cir. 1987) (denying qualified immunity because a "jury could have reasonably believed that the officers were neither threatened by a weapon, nor appeared to be threatened by a weapon, nor were fired upon, but rather that the officers without provocation shot at a nondangerous suspect").

[30] *See Mercado v. City of Orlando,* 407 F.3d 1152 (11th Cir. 2005) (finding that suspect was not actively resisting arrest despite refusal to comply with commands to drop knife).

[31] *Fils v. City of Aventura*, 647 F.3d 1272, 1288 (11th Cir. 2011).

[32] *See Perez*, 809 F.3d at 1219.

### d.  Beck failed to provide any warning of deadly force.

As explained by the Eleventh Circuit, "[r]easonableness is dependent on all the circumstances that are relevant to the officer's decision to use deadly force, including the seriousness of the crime, whether the suspect poses an immediate danger to the officer or others, whether the suspect resisted or attempted to evade arrest, <u>and</u> the feasibility of providing a warning before employing deadly force."[33] The complaint provides no indication that Schultz was given any warning that deadly force would be used before he was shot in the torso.[34] Indeed, even if the court were to consider defendants' extrinsic evidence over plaintiffs' objections, said evidence shows that Beck had ample "time and opportunity to warn [Schultz] that he was planning to use deadly force before he opened fire," but failed to do so.[35] Rather, as transcribed in defendants' brief, during the last minute and eight seconds before Beck shot Schultz in the torso, in response to Schultz's passive non-compliance with the officers' commands, the officers

---

[33] *Jean-Baptiste v. Gutierrez,* 627 F.3d 816, 821 (11th Cir. 2010) (emphasis added).

[34] *See Hunter*, 941 F.3d at 1280 ("[W]e have held that using deadly force without warning on an unarmed, non-resisting suspect who poses no danger is excessive."); *Perez*, 809 F.3d at 1219  (no warning given to suspect before using deadly force).

[35] *Vaughan v. Cox,* 343 F.3d 1323, 1331 (11th Cir. 2003) (denying qualified immunity on summary judgment based in part on finding that it was feasible for officer to give warning of deadly force  while driving parallel to and "alongside the truck for thirty to forty-five seconds before firing his weapon").

communicated to Schultz that they would <u>not</u> shoot him despite his statements otherwise, and explicitly assured him that "Nobody wants to hurt you." (Doc. 11-1, pp. 10-11). At no point during those minute and eight seconds did any officer warn him that failure to comply with their commands would result in the use of deadly force, nor did Schultz take any physically violent or threatening action during that time to authorize Beck's use of deadly force against him.

### 2)  Beck violated clearly established law.

Based on controlling case law from the Supreme Court and Eleventh Circuit, Beck had "fair warning" that "[a] police officer may not seize an unarmed, nondangerous suspect by shooting him dead."[36] Given the facts alleged in the complaint, no reasonable officer could have believed that Schultz posed any threat of physical harm while calmly and slowly walking with both arms by his sides, much less an immediate threat of serious harm. The allegations of the complaint reflect that Schultz did not take any action to demonstrate violence or threaten physical harm against any person, that Schultz was not actively resisting or attempting to flee, and that he remained calm and passive at all times. Thus, as is appropriately alleged in the complaint, Schultz did not pose an immediate threat

---

[36] *Garner*, 471 U.S. at 11 ("Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so.").

of serious injury or death to anyone. Because every reasonable officer would have known that "deadly force cannot be used in non-deadly situations," Beck's use of deadly force violated clearly established law.[37]

As discussed above, because the complaint does not reasonably support any inference that Schultz was armed with a knife or any other potentially dangerous object, the court cannot at this stage assume that Beck observed or otherwise believed that Schultz was holding *anything* (let alone a potentially dangerous object) before he shot and killed Schultz. Even if the Court were to rule that, over plaintiff's objections, it may consider defendants' proffered extrinsic exhibits to adjudicate defendants' motion to dismiss, there is simply no allegation nor obviousness in this record that Schultz was in possession of a dangerous weapon or anything that could have been legitimately or reasonably construed as such. Nor is there any allegation or obviousness in the record as to what Beck saw or heard at the scene before resorting to deadly force. "A police officer may not seize an unarmed, nondangerous suspect by shooting him dead."[38]

---

[37] *Calderin*, 600 Fed. Appx. at 696 (denying qualified immunity for officer who shot suspect who did not make any threatening movements towards the police despite refusal to comply with commands to drop kitchen knife); *Mercado*, 407 F.3d 1152.

[38] *Morton*, 707 F.3d at 1281 (quoting *Garner*, 471 U.S. at 11).

Even assuming that Schultz was holding an object and that Beck was aware of it, there is neither allegation nor evidence that Scout ever used or threatened to use any such object to cause harm against any of the officers.  Schultz was at all times calm and maintained both arms by his sides as he passively took a few slow steps forward, remaining well out of striking distance and at least 20 feet away from any officer, and did not at any point run or lunge toward any officer. Thus, even if he was holding an object, Schultz did not pose any immediate threat.

"The Eleventh Circuit's 2015 decision in *Mercado v. City of Orlando* clearly established that officers cannot use deadly force against a suicidal person who may be armed but who does not pose an immediate threat to the officers."[39] In *Mercado*, police responded to a call and encountered Mercado holding a knife in his kitchen. Like Schultz, Mercado refused the officer's orders to drop the knife, but he took no threatening action against any of the officers. However, because Mercado "was not committing a crime, resisting arrest, or posing an immediate threat to the officers," the Eleventh Circuit concluded that, despite Mercado's non-compliance with the officer's orders to drop his weapon, this "was clearly not a deadly force situation." As such, the court denied qualified immunity relying on "the clearly

---

[39] *Brown*, 273 F. Supp. 3d at 1157.

established principle that deadly force cannot be used in non-deadly situations."[40] Likewise, because every reasonable officer would have known that using deadly force under the non-deadly circumstances alleged in the complaint would violate Schultz's rights, Beck's decision to "shoot him dead" violated clearly-established law. Qualified immunity is thus inappropriate.

Defendants' reliance on *Kisela, Shaw,* and *Sheehan* is misplaced. In *Sheehan,* the suspect "reacted violently" to the officer's arrival and thus "grabbed a kitchen knife with an approximately 5–inch blade and began approaching the officers, yelling something along the lines of 'I am going to kill you. I don't need help. Get out.'"[41] In *Kisela*, the officers had prior knowledge of reports that the suspect "was engaging in erratic behavior with a knife," and resorted to deadly force only when the suspect, with knife in hand, walked "within striking distance" of a woman standing nearby.[42] In *Shaw,* the officers responded to a call reporting "disorderly conduct in progress." Before arriving at the scene, the officers had knowledge that the suspect had a prior violent history of threatening harm while "armed with a

---

[40] *Calderin*, 600 Fed. Appx. at 696 (relying on *Mercado* and denying qualified immunity to officer who shot plaintiff who refused commands to drop knife but who did not make any threatening movements towards the police); *Brown*, 273 F. Supp. 3d at 1157 (denying qualified immunity relying on *Mercado* for clearly-established law).

[41] *City and County of San Francisco v. Sheehan,* 135 S.Ct. 1765, 1770 (2015).

[42] *Kisela v. Hughes*, 138 S.Ct. 1148, 1154 (2018).

knife." After the officers arrived at the scene, they observed the suspect pick up a large hatchet, and only resorted to deadly force when the suspect walked "close to [the officer]—within a few feet" and within striking distance such that he "could have raised the hatchet in another second or two and struck [the officer] with it."[43]

In contrast to each of these cases, Schultz was standing alone with his arms by his sides when he was shot, was not within arm's reach or striking distance of any person, and had taken no prior action to reasonably indicate that he would violently attack any officer or person at the scene, whether using a weapon or otherwise. Unlike the officers in *Kisela, Shaw,* and *Sheehan*, Beck was not confronted with any imminent threat of serious bodily harm to justify his use of deadly force. Thus, qualified immunity remains inappropriate and plaintiffs respectfully request that defendants' motion to dismiss be denied.

## B. THE COMPLAINT SUFFICIENTLY STATES A CLAIM UNDER THE AMERICANS WITH DISABILITIES ACT.

Plaintiffs' ADA and Rehabilitation Act [Section 504] claims are predicated on the proposition that  as a result of Georgia Tech's failure to provide adequate training, Officer Beck failed to accommodate Schultz's disability during the course of an investigation, which led to Beck shooting and killing Schultz.[44] A violation

---

[43] *Shaw v. City of Selma*, 884 F.3d 1093, 1100 (2018).
[44] Defendants argue that Title II does not define "discrimination" to include

of the ADA may be found when police officers "properly investigated and arrested a person with a disability for a crime unrelated to that disability, [but] they failed to reasonably accommodate the person's disability in the course of investigation or arrest, causing the person to suffer greater injury or indignity in that process than other arrestees."[45]

**1)  <u>The ADA applies to in-the-field encounters and arrests</u>**

The Board of Regents argues that Title II and § 504 do not apply to arrests or in-the-field encounters with potentially violent persons, and argues that "[t]he Eleventh Circuit has not directly answered the question of whether these statutes apply to such encounters."[46] The Board then urges the Court to adopt the reasoning of *Hainze v. Richards*, 207 F.3d 795, 801 (5th Cir. 2000).

The Board's reading of *Bircoll* is incorrect. *Bircoll* actually rejects the Fifth Circuit's holding in *Hainze* and holds that the ADA <u>does</u> apply to police-citizen encounters. The issue in *Bircoll* was whether a police officer provided reasonable

---

a failure to accommodate and that Title II's implementing regulations are invalid. *See* Def. Br. at 23 n.11. Plaintiffs do not address this argument because it is a substantive legal argument presented only in a footnote. *See U.S. Sec. & Exchange Comm'n v. Big Apple Consulting USA, Inc.*, 783 F.3d 786, 812 (11th Cir. 2015) (explaining that a litigant's "fleeting footnote explaining" an argument to the district court "in one sentence . . . is insufficient to properly assert a claim on appeal").

[45] *Id.* at 1220-21; *see also Gray v. Cummings*, 917 F.3d 1, 15 (1st Cir. 2019).

[46] *(*Doc. 11-1 at 20) (citing *Bircoll v. Miami-Dade County*, 480 F.3d 1072 (11th Cir. 2007).

accommodations to a deaf driver during a DUI investigation. The Eleventh Circuit held that the ADA applies to arrests—notwithstanding differing approaches in other jurisdictions—because the final clause of 42 U.S.C. § 12132 provides a catch-all prohibiting any discrimination by a public entity, regardless of whether it is connected to a "services, programs, or activities."[47] *Bircoll* analyzed the merits of the driver's ADA claims, and ultimately held that the driver failed to show the denial of a reasonable accommodation. Under this analysis, the exigent circumstances faced by a police officer "go to the reasonableness of the ADA modification" rather than to whether the ADA applies at all.[48]

### 2) The Eleventh Amendment does not bar Plaintiff's ADA claim

The Board of Regent's argument that the ADA claim is barred by sovereign immunity is predicated on its argument that there was no underlying constitutional violation. The Board appears to concede that, if there was an underlying constitutional violation, then it would not be protected by sovereign immunity. This is a correct statement of law.[49] Plaintiffs therefore incorporate their arguments concerning the unconstitutionality of Beck's use of force as set forth above. Plaintiffs further note that the Eleventh Circuit has held that, in the context

---

[47] *See Bircoll*, 480 F.3d at 1085.
[48] *Id.*
[49] *See United States v. Georgia*, 546 U.S. 151, 158–59 (2006).

of discrimination by public universities, the ADA abrogates sovereign immunity even for conduct that is not independently unconstitutional[50].

### 3) <u>The complaint plausibly shows discrimination on the basis of disability</u>

The Board relies on two cases which found that the plaintiffs failed to show discrimination "by reason of" a disability. Both of those cases are distinguishable. First, in *Sanders v. City of Minneapolis, Minn.*, 474 F.3d 523 (8th Cir. 2007), police responded to calls of an erratic driver. When officers approached the car and asked the driver to raise his hands, the driver responded by accelerating toward two of the officers. At least three officers then shot at the car, killing the driver. The driver's widow sued under the ADA and argued that police failed to accommodate the driver's disability, which was bipolar disorder. The Eighth Circuit held that the fact that the driver "may have been experiencing a bipolar episode" did not change the fact that he had used deadly force against the officers[51].

Next, the Board relies on *Hoolihan v. Clayton Cty.*, Georgia, No. 1:10-CV-01753-SCJ, 2012 WL 12888679, at *1 (N.D. Ga. Mar. 12, 2012), *aff'd sub nom. Hoolihan v. Clayton Cty., Ga.*, 507 F. App'x 831 (11th Cir. 2013). In *Hoolihan*, two officers

---

[50] *See Ass'n for Disabled Ams., Inc. v. Fla. Int'l Univ.*, 405 F.3d 954 (11th Cir. 2005).

[51] *Id.*

-22-

found a driver in a parking lot, slumped sideways over the console of the car. The driver was unresponsive.  During the officer's attempt to open the door of the car, the driver awoke and began punching one of the officers.  During the ensuing struggle the driver was injured. It ultimately turned out that the reason for the driver's unresponsiveness and confusion was that he was diabetic and in the throes of severe hypoglycemia. The district court held that the officers were not reacting to the driver's hypoglycemia when they used force to subdue him; rather, the officers were reacting to the driver's resistance.

The situation here is different. First, unlike the suspects in *Hoolihan* and *Sanders*, Schultz did not take any action which constituted a threat to the safety of another person.[52] Whereas the decedents in *Sanders* drove a car at police officers and the plaintiff in *Hoolihan* struck officers, Schultz did nothing to endanger anyone. Schultz's conduct was that he passively failed to follow an order to not move. Second, the only means the officers in *Sanders* and *Hoolihan* had available to mitigate the direct threat was to immediately neutralize the threat by employing tactics that were no different than would be employed against a non-disabled person. Here, the officers had other available options to ensure meaningful

---

[52] (Doc. 1 ¶ 57).

communication with Schultz.  Here, Schultz' death was the result of Georgia Tech's failure to properly train its personnel.  Doc. 1, ¶¶ 59, 60, 67.

### 4) <u>The complaint shows deliberate indifference.</u>

Deliberate indifference requires a showing that "the defendant knew that harm to a federally protected right was substantially likely and . . . failed to act on that likelihood."[53] The response taken by officials must be clearly unreasonable in light of the known circumstances."[54] The question at this stage is whether Plaintiffs have plausibly alleged an ADA claim against the Board resulting from its failure to train its officers in how to assess and deescalate a situation involving a student who is in the midst of a mental health crisis. Under *Twombly*, the factual allegations "simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence" to support Plaintiffs' claims.[55] Here, the complaint alleges that Georgia Tech knew that its police were not properly trained are not able to effectively respond to a mental health crisis. (Doc. 1 ¶¶ 58, 61). There were other non-deadly deescalation techniques available which were employed by officers with proper training. (Doc. 1 ¶¶ 52, 53). Officer Beck had not undergone crisis

---

[53] *Liese v. Indian River Cty. Hosp. Dist.*, 701 F.3d 334, 343–44 (11th Cir. 2012).

[54] *Doe v. Sch. Bd. of Broward Cty., Fla.*, 604 F.3d 1248, 1259 (11th Cir. 2010). The Eleventh Circuit relies on Title IX cases setting forth the deliberate indifference standard when assessing claims under § 504 and the ADA. *See Liese v. Indian River Cty. Hosp. Dist.*, 701 F.3d 334, 347 (11th Cir. 2012).

[55] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

intervention training, and had not been trained on how to handle incidents relating to a mental health crisis. (Doc. 1 ¶ 58). The failure to provide training to its officers meant that Schultz, and others suffering from similar disabilities, would be excluded from the protection offered by campus police in the event of a mental health crisis to which police responded.

## IV.   <u>CONCLUSION</u>

For the reasons set forth above, plaintiffs respectfully pray that defendants' motion to dismiss be denied; and that they have such other and further relief as this Court deems just and proper in the circumstances. Insofar as the Court concludes that there are deficiencies in the Complaint thereby subjecting either of plaintiffs' claims to dismissal, plaintiffs respectfully request that the Court not dismiss the complaint and, instead, grant plaintiffs leave to file an amended complaint; or, in the alternative, that any dismissal be without prejudice.[56]

The undersigned, in accord with L.R. 7.1 and 5.1(C) hereby certifies that the type font used herein is 13-Point Book Antigua font.

This 21st day of January, 2019.

<u>/s/ Dianna J. Lee</u>
Dianna J. Lee
Georgia Bar No. 163391
L. Chris Stewart

---

[56] *Eiber Radiology, Inc. v. Toshiba Am. Med. Sys., Inc.*, 673 F. App'x 925, 929 (11th Cir. 2016).

Georgia Bar No. 142289
*Counsel for Plaintiffs*

**STEWART TRIAL ATTORNEYS**
55 Ivan Allen Jr. Blvd.
Suite 700
Atlanta, Georgia
(855) 222-1619 (Stewart)
(404) 328-7596 (Lee)
cstewart@stewarttrial.com
dlee@stewarttrial.com

/s/ G. Brian Spears
G. Brian Spears
Georgia Bar No. 670112
*Counsel for Plaintiffs*

**G. BRIAN SPEARS, P.C.**
1126 Ponce de Leon Ave., N.E.
Atlanta, Georgia 30306
Phone: (404) 872-7086
Email: Bspears@mindspring.com

/s/ Jeffrey R. Filipovits
Jeffrey R. Filipovits
Georgia Bar No. 825553
*Counsel for Plaintiffs*

**FILIPOVITS LAW, P.C.**
2900 Chamblee-Tucker Road Building 1
Atlanta, Georgia 30341
Tele: (770) 455-1350
 jeff@law.filipovits.com

## CERTIFICATE OF SERVICE

This is to certify that I have this day filed a copy of the foregoing **PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** with the Clerk of Court using the CM/ECF system which automatically sends a service copy via email notification upon all counsel of record in this case.

This 21st day of January, 2019.

/s/ Dianna J. Lee
L. Chris Stewart
Georgia Bar No. 142289
Dianna J. Lee
Georgia Bar No. 163391
*Counsel for Plaintiffs*

**STEWART TRIAL ATTORNEYS**
55 Ivan Allen Jr. Blvd.
Suite 700
Atlanta, Georgia
(855) 222-1619 (Stewart)
(404) 328-7596 (Lee)
cstewart@stewarttrial.com
dlee@stewarttrial.com