**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| THE ESTATE OF SCOTT SCHULTZ, et al., Plaintiffs, | ) | |
| v. | ) | CIVIL ACTION NO. 1:19-cv-4083-JPB |
| BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA, et al., Defendants. | ) | |

**REPLY IN SUPPORT OF MOTION TO DISMISS**

Defendants Board of Regents of the University System of Georgia and Tyler Austin Beck, through counsel, submit this reply in support of their motion to dismiss.

Plaintiffs' response fails to rebut the arguments that are raised in the motion to dismiss. The response argues – in the face of authentic audio and video evidence – that Scout "was slowly walking around" and "did not exhibit any violent, aggressive, or threatening behavior whatsoever" in the encounter with GTPD officers on September 16, 2017. But that description, repeated often in the response, is not accurate as the audio and video record plainly shows. The response also argues that Officer Beck's use of force was excessive because Scout did not "run or lunge" at any person and because no warnings were given that officers might shoot. But those are misstatements of the law. The Eleventh Circuit has made clear that an officer does not have to wait until the

moment that a person uses a deadly weapon to stop the person from doing so, *see Shaw v. City of Selma*, 884 F.3d 1093, 1100 (11th Cir. 2018), and also that there is no "inflexible rule" that requires a warning whenever officers use lethal force. *See Penley v. Eslinger*, 605 F.3d 843, 854, n. 6 (11th Cir. 2010) (rejecting a similar warning argument and explaining that *Tennessee v. Garner* does not require a warning). Finally, the overarching argument in the response is that, on a motion to dismiss for failure to state a claim, this Court must sit with hands tied and limit its consideration to the "four corners of the complaint," even when there is a contemporaneous audio and video record that (1) is central to the claim, (2) is shown by proper affidavit testimony to be authentic, and (3) under settled law is fatal to the claim. This argument too is wrong as will be shown herein.[1]

---

[1] The arguments opposing this Court's consideration of cell phone video are especially disingenuous because Plaintiffs' counsel has given interviews in the news media that reference cell phone video of the event, and also because the same counsel held a press conference referencing the cell phone video after filing this lawsuit. *See* https://stewarttrial.com/recent-news/ (law firm web page link to news media reports featuring cell phone video); *and see also* https://stewarttrial.com/recent-news/page/2/ (law firm web page link to news media reports featuring cell phone video); *and see* https://www.11alive.com/article/news/local/scout-schultz-death-lawsuit/85-8c15fd23-e020-4cb1-89ea-d7bc98975c95 (attorney post-filing press conference where cell phone video is prominently referenced and discussed). It is inaccurate to suggest to this Court as the response does that this portion of the video record was unavailable to Plaintiffs and their counsel when the complaint was drafted. And counsel's reliance on the available cell phone video to make the case in the media shows that Plaintiffs acknowledge that the cell phone video of the event is authentic.

As Defendants' motion shows, the material facts of the complaint are totally discredited by the audio and video record of the event that forms the basis of this action. The audio and video record is central to the Fourth Amendment claim against Officer Beck because it records the very event on which the claim is based. The substantive case law demands this finding that the record is central to the claim. *See Scott v. Harris*, 550 U.S. 372, 380-381 (2007) (holding that when the plaintiff's version of the events is directly and unequivocally contradicted by a videotape of the incident the video controls and the trial court should not rely on the "visible fiction" of allegations that are contradicted by the video). And, in addition to being central to the Fourth Amendment claim, the audio and video record is authentic because it has been shown by proper affidavit testimony to be what it purports to be: audio and video of Scout's encounter with GTPD officers on September 16, 2017. *See Kelly v. Midfirst Bank & McCalla Raymer*, 2012 U.S. Dist. LEXIS 201998, *9 (N.D. Ga. Dec. 28, 2012) (Baverman, M.J.) ("In any event, authenticity simply means that the document is what its proponent says it is.") (citing *Getty Petroleum Marketing, Inc. v. Capital Terminal Co.*, 391 F.3d 312, 324, n. 17 (1st Cir. 2004)). Plaintiffs state in their response that they "do not concede" and that they "dispute" the authenticity of the materials submitted with the motion. But nowhere do they actually challenge the authenticity of any of the material – again, by a showing

that any audio or video recording is not what it purports to be. Plaintiffs' objections to the material are unfounded and this authentic record dooms the Fourth Amendment claim.

Plaintiffs' response also fails to rebut the arguments that are made in Defendants' motion as to the Title II and section 504 claims. These claims fail for several reasons. Scout was shot after advancing on officers with an instrument in an unlawful and threatening manner and after refusing multiple officer instructions to "drop the knife" and "do not move." The use of force here was not "by reason of" Scout's disability, an essential element of these claims; instead, it resulted from Scout's unlawful and threatening conduct. Plaintiffs' response fails to distinguish the instructive cases that were cited in the motion, *Hoolihan v. Clayton Cnty, Ga.*, 2012 U.S. Dist. LEXIS 193704, *24-26 (N.D. Ga. March 12, 2012) (Jones, J.) (finding that it was the plaintiff's resistance to officers, rather than county's alleged failure to train its officers to accommodate individuals with disabilities, that led to his arrest and injuries, and rejecting Title II claim on this basis), and *Sanders v. City of Minneapolis*, 474 F.3d 523, 527-528 (8th Cir. 2007) (finding that it was not the city's alleged failure to train its officers, but the apparent attempt to run over the officers, that precipitated a shooting, and rejecting Title II claim on this basis). The complaint clearly fails the "by reason of" requirement.

The complaint also fails to plead intentional discrimination – that is, deliberate indifference of a responsible official. Again two essential elements are missing here.

First, the complaint does not identify a responsible official who is alleged to have been on notice of discrimination in Georgia Tech's programs or services and to have failed to act to correct such discrimination. That is a fatal omission and it requires dismissal of the Title II and section 504 claims. *See Silberman v. Miami Dade Transit*, 927 F.3d 1123, 1134 (11th Cir. 2019); *Osorio v. Miami-Dade County*, 2018 U.S. App. LEXIS 8567, **2-3 (11th Cir. April 2, 2018) (per curiam) (affirming dismissal of Title II claim where the plaintiff "pled no facts to support the … existence of a Miami-Dade official who had actual knowledge of the police's discrimination of disabled individuals and failed to act accordingly"). Plaintiffs' response does not even mention this argument.

Second, the complaint does not plead deliberate indifference and instead travels under a negligence theory. The complaint alleges that, at the time of Scout's shooting, "the majority of Georgia Tech's police officers had not completed the Crisis Intervention Training," the steps taken by Georgia Tech to train its officers were insufficient to prevent Scout's death, the failure to properly train its police officers "was the result of inaction and decisional failures which occurred well in advance of [Scout's] death," and "the need for such training was well known within the law enforcement community." Doc. 1 ¶¶ 58-61. The complaint also alleges that "studies published" years before Scout's death showed that half of all fatal police encounters "involve persons with psychiatric disorders." *Id.* ¶ 62. The problem with these allegations is that they do not show actual

disability discrimination of which a Georgia Tech official was aware. In other words, they do not show a pattern of past incidents similar to what is alleged in this case. Absent prior incidents, there is no notice of a need for more or better training and no notice of a deficiency in the programs or services. *See Liese v. Indian River Cty. Hosp. Dist.*, 701 F.3d 334, 344-348 (11th Cir. 2012) (deliberate indifference means "deliberate choice"); *Silberman v. Miami Dade Transit*, 927 F.3d 1123, 1136 (11th Cir. 2019) (deliberate indifference means an officer "knows that discrimination has taken place"); *J.S. v. Houston Cty. Bd. of Educ.*, 877 F.3d 979 (11th Cir. 2017) (deliberate indifference means failure to respond to "known circumstances" and "actual knowledge" of "discrimination in the organization's programs"); *Haberle v. Troxell*, 885 F.3d 171, 181-183 (3rd Cir. 2018) (deliberate indifference means "failure to adequately respond to a pattern of past occurrences of injuries like the plaintiff's"); *and see Piazza v. Jefferson Cty.*, 923 F.3d 947, 957 (11th Cir. 2019) (in section 1983 context, "deliberate indifference" generally requires "multiple incidents"). Deliberate indifference is not pleaded, and this also is fatal to the Title II and section 504 claims.

Plaintiffs' response tries an end run around the second fatal defect mentioned above with the assertion "the complaint alleges that Georgia Tech knew that its police were not properly trained are [sic] not able to effectively respond to a mental health crisis." Doc. 24 at 24. As support, the response cites to paragraphs 58 and 61 of the

complaint, *see id.*, but those paragraphs do not allege what Georgia Tech (or, importantly, a responsible Georgia Tech official) knew, and so they do not show deliberate indifference.[2] For these reasons as more fully set forth in Defendants' initial brief, and for the additional reasons stated below, the complaint fails to state a Fourth Amendment claim against Officer Beck and qualified immunity bars that claim, and the complaint also fails to state a Title II and section 504 claim.

### A. Under Settled Law This Court May Consider The Extrinsic Material That Is Submitted With The Motion To Dismiss

Plaintiffs devote much of their response to complaining about the extrinsic material that is submitted with the motion to dismiss and they also have filed a separate "motion to disregard" the material. These complaints and the "motion to disregard" are unfounded.

For many decades it has been recognized by the federal courts and also by the leading commentators on the Federal Rules of Civil Procedure that extrinsic material is properly considered on a motion to dismiss, without conversion of the motion to one for summary judgment, when the material is "integral" or "central" to the claims and when it is shown to be authentic. *See, e.g., Fudge v. Penthouse Int'l*, 840 F.2d 1012, 1015 (1st Cir. 1988) ("Although 'there is no requirement that the pleader attach a copy of the

---

[2] Paragraph 58 states: "At the time that Beck fired his weapon, according to news reporting at the time, the majority of Georgia Tech's police officers had not completed Crisis Intervention training." Doc. 1 ¶ 58. Paragraph 61 states: "The need for such training was well known within the law enforcement community. Doc. 1 ¶ 61.

writing on which his action or defense is based[,] . . . when plaintiff fails to introduce a pertinent document as part of his pleading, defendant may introduce the exhibit as part of his motion attacking the pleading.'") (quoting 5 C. Wright & A. Miller, *Federal Practice and Procedure* § 1327 at 489 (1969)); *Beddall v. State St. Bank & Trust Co.*, 137 F.3d 12, 16-17 (1st Cir. 1998) (considering agreement that was neither appended to nor expressly incorporated by reference into the complaint) (citing 2 Moore's Federal Practice § 12.34[2] (3d ed. 1997)).

This principle applies to video evidence just as it applies to documents. *See Speaker v. United States HHS CDC & Prevention*, 623 F.3d 1371, 1379-1380 (11th Cir. 2010); *accord Bailey v. City of Ann Arbor*, 860 F.3d 382, 386-387 (6th Cir. 2017); *Bogie v. Rosenberg*, 705 F.3d 603, 608-609 (7th Cir. 2013).

Finally, this principle applies even when the complaint omits any reference to the extrinsic material that is attached to the motion to dismiss. This appears to be the central argument that Plaintiffs advance in opposition to the material that is submitted with the motion to dismiss – *i.e.*, that Plaintiffs themselves do not refer to the material in their complaint. But that is not the test. While some Eleventh Circuit cases mention that extrinsic material can be considered when it is referenced in a complaint, the cases make plain that a reference to the material is not required and instead there are only two prerequisites for consideration of extrinsic material: centrality and authenticity. *See, e.g.*,

*Speaker*, 623 F.3d at 1379; *Horsley v. Feldt*, 304 F.3d 1125, 1133-1135 (11th Cir. 2002); *Maxcess, Inc. v. Lucent Techs., Inc.*, 433 F.3d 1337, 1340, n. 3 (11th Cir. 2005) (same, and considering purchase agreement that was neither mentioned in nor attached to complaint); *and see In re ING Groep, N.V. ERISA Litig.*, 749 F. Supp.2d 1338, 1343-1344 (N.D. Ga. 2010) (Carnes, J.) (same, and considering market conditions documents that were not referenced in complaint because they were central to claims and undisputed as to authenticity); *and see also Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) (affirming incorporation of materials that complaint did not reference at all), cited with approval in *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002-1003 (9th Cir. 2018).

As shown, the centrality and authenticity requirements are both met with respect to the audio and video record that is submitted with the motion to dismiss. Accordingly, this material can and should be considered by the Court in ruling on the motion.

**B. Plaintiffs' Arguments Under The *Graham* Factors Lack Merit**

Plaintiffs' response argues that the *Graham* factors[3] are not satisfied, but the arguments misstate the law and/or fail to account for significant distinctions in the cases.

*Severity of the crime*. The response asserts that Scout's advance on the officers with a weapon or instrument in hand did not constitute felony obstruction or aggravated

[3] *Graham v. Connor*, 490 U.S. 386, 396, 109 S. Ct. 1865, 1872 (1989).

assault, citing as support *Hoglen v. State*, 336 Ga. App. 471 (2016), and *In re C.S.*, 251 Ga. App. 411 (2001). It argues that, under *Hoglen*, actual violence such as "punching, choking, kicking, or biting" is required for felony obstruction. That is not what *Hoglen* holds. Rather, the case makes clear that offering violence, even by words alone, can amount to felony obstruction. 336 Ga. App. at 476. The response argues that, under *In re C.S.*, Scout did not "commit an act" that could constitute aggravated assault because, "at worst, [Scout's] failure or inability to comply with the officers' verbal commands while slowly and passively walking around with both arms by his side, amounts to misdemeanor obstruction without violence." Doc. 24 at 11. In *In re C.S.*, a young girl holding a knife stood perfectly still and did not respond when an officer directed her to put the knife down. The girls' father then walked up to her and took the knife from her. In the entire encounter the girl made no movement toward the officer. The court held that in this circumstance there was no act that could constitute aggravated assault. 251 Ga. App. at 411-413. *In re C.S.* is completely unlike the facts in this case because Scout advanced on the officers in the face of the clear and repeated instructions "drop the knife," "drop it," and "do not move." As subsequent Georgia cases have explained, the key to the holding in *In re C.S.* was that the girl remained motionless, in other words she did not approach the officer with the knife or take any other act that could create a reasonable

apprehension of harm. *See Preston v. State*, 300 Ga. App. 433, 434 (2009); *Daniels v. State*, 298 Ga. App. 736, 737-738 and n. 15 (2009).

*Immediacy of the threat*. The response argues that Scout was merely "walking forward" when they were shot and had "not at any point prior taken any action to reasonably indicate that he would suddenly run or lunge toward the officers to physically attack." Doc. 24 at 11-12. As stated above, this argument is premised on a misstatement of the law. An officer does not have to wait until the moment that a person uses a deadly weapon to stop the person from doing so. *See Shaw v. City of Selma*, 884 F.3d 1093, 1100 (11th Cir. 2018). Both *Shaw* and *Penley* describe circumstances that are similar to those presented in this case: a person with a potentially deadly weapon refuses to comply with repeated commands to drop the weapon. In each case the use of lethal force was upheld. *See Shaw*, 884 F.3d at 1096-1098; *Penley*, 605 F.3d at 849-854.

*Active resistance or attempts to flee*. The response posits that this case is like other cases where a use of force was found unreasonable because there was no active resistance or attempt to flee. The three cases that are cited as support are distinguishable and completely unlike this case. In *Mercado v. City of Orlando*, 407 F.3d 1152 (11th Cir. 2005), officers responded to an attempted suicide, finding Mercado sitting on his kitchen floor, crying, with a telephone cord wrapped like a noose around his neck and a knife held with both hands with the tip pointed at his own heart. When officers told Mercado

two times to drop the knife "he refused without making any threatening moves toward the officers." 407 F.3d at 1154. Nonetheless, the officers shot him with a stun device, inflicting serious injury. *Id.* at 1155. This case is different. Scout was not passively sitting on a kitchen floor and instead they advanced on multiple officers down and across a college campus street. Scout did not remain still when instructed repeatedly "drop the knife," "drop it," and "do not move." Instead, they came at the officers after these commands were given as the video record plainly shows. The other two cases cited as support, *Fils v. City of Aventura*, 647 F.3d 1272 (11th Cir. 2011), and *Perez v. Suszczynski*, 809 F.3d 1213 (11th Cir. 2016), are even less helpful to Plaintiffs. In *Fils*, a concertgoer was shot with a taser in the chest while his hands were up and he was backing away from an officer, and then when he did not immediately fall to the ground he was shot again with a second round of taser probes. At no time did he advance on the officers who nonetheless tased him and used other force without provocation. 647 F.3d at 1288. And in *Perez*, officers shot a suspect who was face down on the ground with his arms restrained. 809 F.3d 1219-1221.

*Whether officers gave warning of a possible use of force*. The response next argues that Officer Beck's use of force in the circumstances was unreasonable because "the complaint provides no indication that [Scout] was given any warning that deadly force would be used before he was shot in the torso." Doc. 24 at 14. As stated above, this

argument is premised on a misstatement of the law. As the Eleventh Circuit explained in *Penley*, there is no "inflexible rule" that requires a warning whenever officers use lethal force. 605 F.3d at 854, n. 6 (rejecting a similar warning argument and explaining that *Tennessee v. Garner* does not require a warning). Moreover, the cases that are cited in the response as support for this argument are of no help to Plaintiffs. In *Jean-Baptiste v. Gutierrez*, 627 F.3d 816 (11th Cir. 2010), an officer fired shots on a suspect who was standing facing him with a gun in his hand but not pointed, and no warning was given. Still the use of force was found reasonable. *Id.* at 819, 821-822. In *Hunter v. Leeds*, 941 F.3d 1265 (11th Cir. 2019), officers fired an initial round of shots at a suspect who then dropped his weapon, but then the officers fired a second round of bullets at the suspect who by that time was unarmed and not resisting. *Id.* at 1279-1280. The Eleventh Circuit held that the first round of shots was not unreasonable, but the second round which occurred without warning was unreasonable and violated the Fourth Amendment. *Id.* at 1280. And in *Vaughn v. Cox*, 343 F.3d 1323 (11th Cir. 2003), police officers fired shots into a moving vehicle that was suspected of having been stolen. *Id.* at 1330. There was no indication that the stolen vehicle presented a dangerous condition to the officers or to other cars on the highway. *Hunter* and *Vaughn* are distinguishable in that it can be said that no threat or risk of harm existed at the time force was used, such that a warning was feasible. Not so in this case, where the video record plainly shows that Officer Beck

discharged his service weapon as Scout was advancing upon him and after Scout had advanced in a similar manner on other officers in the encounter despite repeated efforts to get them to stop the advance.[4]

As shown, Plaintiffs' arguments on the *Graham* factors lack merit. Importantly, however, the factors are not "prerequisites to the lawful application of deadly force." *Penley*, 605 F.3d at 850. But, in any event, in this case the factors all point to the conclusion that Officer Beck's use of force was reasonable under the circumstances.

**C. Qualified Immunity Bars The Fourth Amendment Claim**

As stated in Defendants' initial brief, the Supreme Court has said that "specificity is especially important in the Fourth Amendment context, where … it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152-1153 (2018) (per curiam) (quoting *Mullenix* v. *Luna*, 136 S. Ct. 305 (2015) (per curiam)). "Use of excessive force is an area of the law 'in which the result depends very much on the facts of each case,' and thus police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue." *Id.* In the Eleventh Circuit, only United States Supreme Court, Eleventh Circuit, and Georgia

---

[4] The response also cites *Perez* as support for this argument about the absence of a warning. Again, in *Perez* the officers shot a suspect who was face down on the ground with his arms restrained. 809 F.3d 1219-1221. *Perez* is unlike this case, and instead is like *Hunter* and *Vaughn*, because a warning there was feasible.

Supreme Court cases can clearly establish the contours of federal law. *See Jenkins v. Talladega City Bd. of Educ.*, 115 F.3d 821, 827 (11th Cir. 1997) (en banc).

Plaintiffs' response does not identify any case that clearly establishes that Officer Beck's use of force in the circumstances was unreasonable and in violation of the Fourth Amendment. The qualified immunity section of the response (Doc. 24 at 15-19) cites only three cases, none of which clearly establishes the law against Officer Beck: *Mercado* (discussed *supra* at 11-12); an unreported case, *Calderin v. Miami-Dade Police Dept.*, 600 Fed. Appx. 691 (11th Cir. 2015), which like *Mercado* involved an officer shooting of a suicidal person who was holding a knife but had not made any threatening movement toward the officer, *id.* at 694-695; and *Morton v. Kirkwood*, 707 F.3d 1276 (11th Cir. 2013), a case where an officer "shot an unarmed man in a stationary vehicle while having no reason to believe that the man would place anyone's safety in danger." *Id.* at 1282. *Mercado*, *Calderin*, and *Morton* are completely unlike this case and so they do not clearly establish that Officer Beck's conduct was unlawful. *Kisela*, *Shaw*, and *Sheehan* further show the use of force was lawful. Qualified immunity bars the Fourth Amendment claim.

Defendants rely on the above arguments and on their prior brief including with respect to the Title II and section 504 claims. For all of the reasons stated herein and previously, Defendants respectfully ask that the Court grant their motion and dismiss the complaint and the claims asserted against them.

Respectfully submitted,

CHRISTOPHER M. CARR 112505
Attorney General

KATHLEEN M. PACIOUS 558555
Deputy Attorney General

s/ Roger A. Chalmers 118720
ROGER A. CHALMERS
Senior Assistant Attorney General

LAURA L. LONES 456778
Senior Assistant Attorney General

PLEASE ADDRESS ALL
COMMUNICATIONS TO:
Roger A. Chalmers
State Law Department
40 Capitol Square SW
Atlanta, GA 30334
Tel: (404) 463-8850
Fax: (404) 651-5304
Email: rchalmers@law.ga.gov

**CERTIFICATE PURSUANT TO LOCAL RULE 7.1.D**

I certify that the foregoing brief conforms to the requirements of L.R. 5.1C. The brief is prepared in 14 point Times New Roman font.

s/ Roger A. Chalmers

**CERTIFICATE OF SERVICE**

I certify that I have this day served the foregoing pleading with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to the following attorneys of record:

George Brian Spears
Larry Christopher Stewart

I further certify that I have mailed by United States Postal Service the document to the following non-CM/ECF participants: NONE.

This 18th day of February, 2020.

s/ Roger A. Chalmers