UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| THE ESTATE OF SCOTT SCHULTZ, WILLIAM SCHULTZ and LYNNE SCHULTZ, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | Civil Action File No. |
| | ) | |
| | ) | 1:19-cv-4083-JPB |
| | ) | |
| BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA By and on behalf of GEORGIA INSTITUTE OF TECHNOLOGY, and TYLER AUSTIN BECK, | ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

## AMENDED COMPLAINT

*Jurisdiction and Venue*

1    This action arises under the authority vested in the Court by virtue of 42

U.S.C. §§ 1983, 1988, and 28 U.S.C. §§ 1313 and 1343(3). The conduct

giving rise to this action occurred on the Atlanta, Georgia campus of the

Georgia Institute of Technology in Fulton County, Georgia, and venue is

thereby proper in the Atlanta Division of the Northern District of Georgia.

1

*Parties*

2    William Schultz is the father of Scott Schultz; he is an adult citizen of the

      United States of America and the State of Georgia.

3    Lynn Schultz is the mother of Scott Schultz; she is an adult citizen of the

      United States of America and the State of South Carolina.

4    William Schultz and Lynn Schultz are the holders of the right under Georgia

      law to bring this action arising from the wrongful death of their child.

5    The Estate of Scott Schultz is represented by William Schultz, having been

      appointed as the Administrator of the Estate by the Probate Court of

      Gwinnett County, Georgia. The Estate of Scott Schultz holds the right under

      Georgia law to bring this action to seek relief for the injuries and losses

      inflicted upon Scott Schultz by the Defendants in advance of Scott Schultz's

      death, along with other proper relief.

6    The Defendant Board of Regents of the University of Georgia State of

      Georgia by and on behalf of Georgia Institute of Technology is a Georgia

      state agency located at 244 Washington Street, S.W., Atlanta, Georgia

      30334, hereinafter "Georgia Tech." The Board of Regents and Georgia Tech

      are subject to suit by virtue of Title II of the Americans with Disabilities

2

Act. The Board of Regents, along with Georgia Tech, is a public entity which receives financial assistance from the government of the United States of America and is subject to the provisions of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and 42 U.S.C. § 2000d-7.

7    Georgia Tech is a general academic teaching institution and is a unit of the University System of Georgia, which is governed by the Board of Regents of the University System of Georgia.

8    Tyler Austin Beck is an adult citizen of the State of Georgia who, at all times pertinent to this suit, was employed by Georgia Tech as a law enforcement officer and acted under color of law for purposes of 42 U.S.C. § 1983. He is sued herein in his individual capacity.

*Factual allegations common to all counts*

9    Scott "Scout" Schultz was shot and killed by Officer Tyler Austin Beck on September 16, 2017 at approximately 11:20 p.m.

10   At the time Schultz was shot and killed, Schultz was a student at Georgia Tech enrolled in their[1] senior year.

---

[1]   Scout Schultz used the pronouns "they" and "their" and Plaintiffs have honored this use throughout this Amended Complaint.

3

11    Schultz had received a scholarship to attend Georgia Tech and initially

      enrolled in the summer of 2014.

12    Schultz had attained a grade point average of 3.9 as of the time of their

      death and was majoring in computer engineering.

13    Like many other Georgia Tech students, Schultz suffered from mental health

      issues.

14    Those mental health issues included, but were not limited to, clinical

      depression.

15    On the evening of September 16, 2017, Schultz was experiencing a mental

      health crisis.

16    On September 16, 2017, Georgia Tech police officers responded to a

      suspicious person report in the West Village area of Georgia Tech.

17    The information known to all responding police officers, including Officer

      Beck, did not include any indication that there was any crime in progress or

      that the subject of the call posed a danger to the public.[2]

---

[2]  Defendants have produced an audio recording of the 911 call made by Schultz
which led to officers being dispatched. Defendants, however, refused to produce
the audio dispatch recording which would show what information was *known* to
the officers who responded to the scene. The 911 call itself is irrelevant because
the officers were not parties to that call, and the Fourth Amendment inquiry
looks to what information was known to the officers. *See, e.g.*, *Stephens v.*

4

18    At approximately 11:22 p.m., two Georgia Tech police officers encountered
      Schultz after responding to the 911 call.

19    Schultz loosely fit the description they provided to the 911 dispatcher.

20    While Schultz was holding an object in their right hand, no blade could be
      seen by the officers. The object did not appear to be a knife.

21    When the first two officers arrived in two separate patrol cars, Schultz was
      walking calmly on a sidewalk.

22    When those officers spotted Schultz, one made contact with Schultz on the
      sidewalk while the other immediately drew his firearm and pointed it at
      Schultz.

23    Schultz had no legal obligation to speak with the officers.

24    Based on the information actually known to and observed by officers upon
      their arrival, the officers did not have reasonable suspicion to believe that
      Schultz committed any crime.

---

*DeGiovanni*, 852 F.3d 1298, 1321 (11th Cir. 2017) ("a court must ask whether a
reasonable officer would believe that this level of force is necessary in the
situation at hand") (emphasis added). Plaintiffs have requested a copy of the
dispatch recordings at issue, and Georgia Tech has refused to provide them. *See*
¶¶ 108–15, *infra*.

25    At the time those officers arrived, they did not have reasonable articulable suspicion that would justify conducting a *Terry* stop of Schultz. Schultz was a student actively enrolled at Georgia Tech and was authorized to be standing where he was when the officers first confronted him and was not committing any crime.

26    Schultz did not respond or react to the officers, and continued walking calmly along the sidewalk with his arms and hands by his sides.

27    Schultz was not drunk or otherwise intoxicated, nor did he appear to be.

28    The officers walked with Schultz with their guns drawn, and continued to maintain a safe distance between Schultz and themselves.

29    Schultz walked slowly, and did not make any aggressive gesture to either officer.

30    Schultz did not make any verbal threat to either officer.

31    Schultz did not take any action or make any statement to indicate any intent to harm any other person during their encounter with the officers.

32    Schultz walked slowly for about 80 feet while both officers walked ahead of them, backwards, with their guns drawn and pointed at Schultz. Neither officer verbally threatened to shoot Schultz.

33      During the time Schultz walked, the officers maintained a distance of about

        15 feet from Schultz.

34      Schultz paused briefly, and then crossed the street as a third officer, Officer

        Tyler Beck, arrived on scene.

35      Officer Beck maintained a distance of about 50 feet from Schultz and the

        other officers, but had his gun drawn, pointed at Schultz and was prepared

        to fire.

36      A fourth officer then arrived on the scene, and positioned himself closer to

        Schultz and the two initial officers.

37      The three officers in closest proximity to Schultz were employing a variety

        of techniques to attempt to safely deescalate the situation. Specifically, these

        officers (which did not include Beck) told Schultz that they did not want to

        hurt Schultz; they asked for Schultz's name, and asked what Schultz's

        problem was.

38      These questions are designed to elicit a response from a person in a mental

        health crisis, and to attempt to help the person in the crisis focus their

        attention away from the stress associated with the sudden presence of armed

        police officers.

39     The officer who arrived on the scene after Officer Beck did not draw his gun.

40     Instead, that officer held a canister of oleoresin ("O.C.") spray.

41     All of the officers other than Beck maintained a distance of at least 15 feet from Schultz.

42     Soon thereafter, Officer Beck moved towards Schultz from what had originally been a considerable distance away and joined the other officers in surrounding Schultz.

43     Officer Beck pointed his firearm directly at Schultz.

44     Schultz then walked two steps toward the officer who arrived on the scene after Beck. When Schultz took these steps, the officer moved back two steps and raised his O.C. spray. Schultz's arms remained lowered, along the side of his body, and remained in that position until he was shot.

45     Each of the four officers, including Beck, was equipped with O.C. spray.

46     Each of the four officers, including Beck, could see the Schultz did not have a knife in their hand.

47    While Schultz did hold an object in their right hand, the object was a blunt
      instrument with no visible blade. None of the officers observed the blade of
      a knife in Schultz's hand.

48    During the entire in person encounter with police officers, Schultz never
      claimed to possess a knife, never displayed an object that appeared to be a
      knife, and never brandished or threatened to use a knife or any other
      weapon against the officers on the scene.

49    Each officer could see, due to Schultz's clothing, that Schultz was not armed
      with a gun. There was nothing strapped to Schultz' side. There was no bulge
      in any of Schultz' pockets.

50    After Schultz made two steps toward the officer holding O.C. spray, Schultz
      stopped.

51    That officer did not use O.C. spray and still did not perceive Schultz an
      imminent threat.

52    At this point, no officer warned Schultz that if he continued to move or walk
      that the officer might use deadly force. The officers, including Beck, had
      ample time and opportunity to warn Schultz that they might use deadly

force against Schultz if he continued to walk. Neither of them issued such a warning.

53    To the contrary, one officer continued to ask for Schultz's name and Schultz had already been told that the officers did not intend to hurt him.

54    Beck and the other officers knew that Schultz did not present a danger and that Schultz appeared to be suicidal. Schultz screamed at the officers "Shoot me!" and one officer replied that no one wanted to hurt Schultz.

55    At no point during the encounter did any officer warn Schultz that they would use deadly force if Schultz did not comply with their commands.

56    Schultz then slowly took three steps forward at a slow walking pace toward Officer Beck.

57    At the point Schultz began walking, all officers were at least 15 feet away from Schultz and all officers were in a position to maintain that same distance by walking backward.

58    The pace at which Schultz walked was consistent with their walking pace for the duration of their entire encounter with police.

59    At no point during the encounter did Schultz run or charge toward any of the officers.

60      No officer ever warned Schultz that continuing to slowly walk forward—as Schultz had for the duration of the encounter with police—would result in the use of deadly force.

61      Each officer on the scene was equipped with O.C. spray.

62      O.C. spray provided a safe and non-lethal way to incapacitate Schultz.

63      O.C. spray would have been effective at a distance of up to 20 feet.

64      There were no members of the public in the immediate vicinity of Schultz's location.

65      No officers or members of the public were placed in danger by Schultz.

66      Schultz was not aggressive and did not threaten any officer or member of the public with violence.

67      Schultz was not within 10 feet of any officer or member of the public.

68      Each officer, including Defendant, had the training, opportunity, and ability to safely deploy O.C. spray to incapacitate Schultz if the officer believed Schultz posed a physical threat.

69      Without warning, as Schultz completed their third step, Officer Beck fired a single bullet into Schultz's chest.

70      Once he was shot, Schultz did not die immediately.

71    Schultz endured pain and emotional harm in anticipation of their own death.

72    The death certificate declared, correctly, that Schultz's death was caused by a gunshot wound to his torso.

73    Schultz was pronounced dead just after midnight on the morning of September 17, 2017.

74    Schultz died solely as a result of the gunshot wound.

75    No officer on the scene reasonably perceived Schultz as an such an immediate threat that it would justify the use of deadly force.

76    At the time of the shooting, none of the officers on the scene reasonably believed that Schultz had committed any crime.

*Open records requests*

77    As of the preparation of this Amended Complaint, Plaintiffs have, through their counsel, repeatedly sought, without success, to obtain the investigative records of Georgia Tech and the Georgia Bureau of Investigation

78    The records sought include, but are not limited to, witness statements, photographic and auditory recordings, still photos, ballistics evidence, and physical evidence.

79    The only records produced have been the videos filed by Georgia Tech during the course of this litigation.

80    Even after this lawsuit was filed, Georgia Tech responded to Plaintiffs' open records request by stating that it did not possess any of the records sought in Plaintiffs' open records requests.

81    On May 12, 2020, Georgia Tech responded to Plaintiffs' open records request by stating that "no records have been identified as responsive to your request. The Office of Institute Communications considers your request closed."

82    Defendants have not produced all records sought by Plaintiffs or all records that are actually within their possession. Defendants possess more than the video evidence which they previously disclosed in this litigation.

83    These records include, but are not limited to, witness statements, investigative reports, dispatch communications, police radio communications, and other physical evidence.

84    As a result of the denial of access to the information contained within those files, Plaintiffs have filed a lawsuit against these entities under Georgia's

Open Records Act. That lawsuit is pending in the Fulton County Superior Court, case no. 2020CV340919.

<u>Count I</u>
*Violation of the Fourth Amendment under 42 U.S.C. § 1983*
*against Defendant Beck*

85     As described in paragraphs 9–76, Officer Beck violated the Fourth Amendment by using excessive force against Schultz by shooting Schultz, without warning, when Schultz did not present a direct threat to the safety of the officers on the scene.

86     Officer Beck's use of excessive deadly force violated clearly established law.

87     Officer Beck's use of force was the proximate cause of Schultz's pre-death pain and suffering and Schultz's death.

<u>Count II</u>
*Violation of the Americans with Disabilities Act and Rehabilitation Act*
*against Defendant Board of Regents*

*Applicability of the ADA and RA*

88     The Board of Regents is a public entity under 42 U.S.C. § 12131(1).

89     As recipients of federal funds, the Board of Regents is subject to Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. §794) to make reasonable

accommodations to persons with disabilities in their facilities, program activities and who receive their services. Such recipients are further required to modify such facilities, services, and programs as necessary to accomplish this purpose. Accordingly, these Defendants are subject to the mandate of Section 504.

*Schultz was a qualified individual under the ADA and RA*

90   Schultz was disabled within the meaning of the ADA and RA, because they suffered from depression and other mental conditions which limited their major life activities.

91   Schultz was regarded as having a disability by each officer who responded to the scene and interacted with Schultz.

92   Schultz was entitled to receive the following benefits from Georgia Tech: mental health services, and emergency mental health services.

93   Specifically, Schultz was entitled to receive emergency mental health treatment from police officers who are properly trained to respond to such an emergency.

94   Schultz's actions as of the time that he was told not to move were consistent with a person who is experiencing a mental health crisis and were actions

which a reasonably trained law enforcement officer would recognize as such.

*Knowledge of the need for training and deliberate indifference to it, and discriminatory animus on behalf of Georgia Tech officials*

95    The failure to properly train its police officers in Crisis Intervention Techniques was the result of inaction and decisional failures which occurred well in advance of Schultz' death.

96    The need for such training was well known within the law enforcement community and Georgia Tech administration.

97    In 2017, nearly 10% of students at Georgia Tech reported that they considered suicide.

98    In 2017, Georgia Tech provided students with only 2 hours of counseling time with a psychiatrist for each school year.

99    For Georgia Tech students facing a severe mental health crisis the average wait to see a counselor was 9 days.

100    In 2017, Georgia Tech did not have any means of responding to a student's immediate mental health crisis, suicide attempt, or other mental health emergency aside from sending police officers employed by Georgia Tech.

16

101   Georgia Tech police are in a unique position compared to police officers employed by counties and municipalities because they are charged with the duty to respond to mental health incidents for students on campus who face higher rates of suicide and mental illness than the general public.

102   Georgia Tech employees who had the authority to require more extensive training of officers employed by Georgia Tech knew of the mental health crisis on the Georgia Tech campus, and knew of the lack of immediate resources for students in the midst of a mental health crisis.

103   At the time of Schultz's death, only 18 of the 89 officers employed by Georgia Tech had received crisis intervention training.

104   At the time of the shooting, Officer Beck was 23 years old.

105   Officer Beck was employed by the Georgia Tech Police Department since May 21, 2016.

106   Officer Beck did not receive crisis intervention training.

107   Crisis intervention training was not required for police officers employed by Georgia Tech.

108   Georgia Tech did not require officers who did not receive crisis intervention training to defer to officers who had received it.

17

109    Officers who do not receive crisis intervention training are ill-equipped to
       respond to a student's mental health crisis.

110    Studies published years in advance of Schultz's death estimated that "at
       least half" of all fatal police encounters involve persons with psychiatric
       disorders. Kelley Bouchard, "Across Nation, Unsettling Acceptance When
       Mentally Ill in Crisis are Killed," Portland Press Herald, Dec. 9, 2012.

111    If Beck had completed crisis intervention training, he would not have killed
       Schultz.

112    Schultz's death was the result of Georgia Tech's and the State of Georgia's
       failure over time to properly train their law enforcement personnel to act in
       such a way as to prevent the exclusion of persons such as Scott Schultz
       from the safety to which all students were entitled on the campus of Georgia
       Tech.

113    Schultz and other students suffering from mental health disorders were
       entitled to receive reasonable accommodations from Georgia Tech in the
       form of emergency services which did not treat students as criminals when
       in the midst of a mental health crisis.

114   Schultz had not committed any crime, and with discriminatory animus toward individuals in a mental health crisis.

*Causation*

115   The specialized training, Crisis Intervention Techniques, trains an officer in methods to de-escalate a potentially dangerous situation when dealing with a person undergoing a mental health crisis or engaging in behavior reflective of mental illness.

116   Crisis Intervention Techniques equip police officers with the observational skills to judge when a subject whom they are confronting is undergoing a mental health crisis or is otherwise engaging in behavior reflective of mental illness.

117   Officer Beck was not one of those officers and had not received crisis intervention training.

118   Several of the officers at the scene remained calm and followed standard de-escalation techniques without initiating physical force directed at Scott Schultz.

119   Unlike the other officers, Officer Beck did not de-escalate and instead used physical force.

120    Immediately after Schultz was told not to move by one of his fellow

officers, Beck shot Schultz – firing his weapon one time.

121    Beck was the only officer to fire his weapon at Schultz.

122    At the time that Beck fired his weapon, Schultz had taken no physical or

verbal action which objectively constituted an imminent threat to the

physical safety of Beck or the other officers.

123    At the time that Beck fired his weapon, Schultz had taken no physical or

verbal action which constituted a threat to the physical safety of another

person.

124    At the time that Beck fired his weapon, only one quarter of Georgia Tech's

police officers had actually completed Crisis Intervention Training.

125    The steps taken by Georgia Tech to train its officers in Crisis Intervention

Techniques were clearly insufficient to prevent Schultz's death.

126    Schultz would not have been subjected an illegal seizure under the Fourth

Amendment if they did not present as a person in mental health crisis.

127    Schultz would not have been shot and killed by Officer Beck if Schultz had

not presented as a person in a mental health crisis and if Beck had received

Crisis Intervention Techniques training.

128     The sole basis for the initial illegal seizure of Schultz was based upon the unfounded assumptions by the officers that a person experiencing a mental health crisis should be treated as a criminal suspect.

129     Officer Beck regarded Schultz as a presenting a danger due to biases and prejudices associated with Schultz's disability.

130     As previously stated, officials employed by Georgia Tech charged with the responsibility of overseeing student mental health care knew that there was a lack of mental health treatment available to students on the campus, a lack of emergency mental health care available to students on campus, and that police officers lacked training necessary to intervene in a student's mental health crisis.

131     These officials knew that students coping with mental illness did not receive needed treatment on a routine basis.

132     These officials knew that officers lacked training needed to respond to mental health emergencies and that, as a result, officers would use force greater than necessary and detain students in violation of the Fourth Amendment when responding to mental health calls.

*Prayer for Relief*

For and upon the foregoing, Plaintiffs pray that this Court:

a.    Afford them a trial by jury as to all claims and issues for which a jury
      is available.

b.    Award them all damages available to the Estate of Scott Schultz which
      are permitted by the laws of the State of Georgia and the laws of the
      United States; these damages include nominal, special, compensatory,
      and punitive damages. These damages relate to those suffered prior to
      Schultz's death.[3] The Estate does not seek punitive damages against
      Georgia Tech.

---

[3]   Section 1983 creates a civil cause of action for any person whose rights are
      violated under color of law. 42 U.S.C. § 1983. The statute does not, however,
      specify the remedies, nor does it address whether the cause of action survives
      the death of the injured person. Id. Congress instead has directed courts to "turn
      to 'the common law, as modified and changed by the constitution and statutes of
      the [forum] State,' as long as these are 'not inconsistent with the Constitution
      and laws of the United States.'" *Robertson v. Wegman*, 436 U.S. 584, 588
      (1978) (quoting 42 U.S.C. § 1988). Courts thus look to forum state statutes for
      the remedies available under § 1983. *Id.* at 589. Georgia law provides that the
      measure of damages for wrongful death is the full value of the life of the
      decedent. O.C.G.A. § 51-4-1(1). Georgia law provides that the estate may
      recover damages for a decedent's pain and suffering in the last moments of
      consciousness. *Beam v. Kingsley*, 255 Ga. App. 715 (2002); *TGM Ashley Lakes,
      Inc. v. Jennings*, 264 Ga. App. 456 (2003).

    c.      Award William Schultz and Lynne Schultz all damages which are available as a result of Scott Schultz's wrongful death; these damages include nominal, special, and compensatory, and punitive damages. William and Lynne Schultz do not seek punitive damages against Georgia Tech.

    d.      Award the Plaintiffs such costs and attorneys' fees as are available under 42 U.S.C. §  1988 and any other law authorizing such an award.

    e.      Award Plaintiffs all other relief to which they are entitled either at law or in equity.

Submitted this 1st day of October, 2019.

| | |
|---|---|
| **L. Chris Stewart** | **Brian Spears** |
| L. Chris Stewart | Brian Spears |
| Georgia Bar No. 142289 | Georgia Bar No. 670112 |
| | |
| **Dianna Lee** | **Jeff Filipovits** |
| Dianna Lee | Jeff Filipovits |
| Georgia Bar No. 142289 | Georgia Bar No. 825553 |
| | |
| Stewart Miller Simmons | Spears & Filipovits, LLC |
| 55 Ivan Allen Blvd., NW, Suite 700 | 1126 Ponce de Leon Ave., N.E. |
| Atlanta, GA 30308 | Atlanta, Georgia 30306 |
| (844) 874-2500 | Phone: (404) 872-7086 |
| cstewart@smstrial.com | brian@brianspearslaw.com |
| dlee@smstrial.com | jeff@civil-rights.law |